Robert **HOOPES** and Rae S. Hoopes,
Appellants,

v.

**UNION OIL COMPANY OF CALIFOR-
NIA**, a corporation, Appellee.

No. 20185.

United States Court of Appeals
Ninth Circuit.

Feb. 3, 1967.

W. C. Arnold, Anchorage, Alaska, for appellants.

Herbert S. Little, Richard W. Hemstad, of Little, Gandy, Stephan, Palmer & Slemmons, Seattle, Wash., Edward A. Merdes of McNealy & Merdes, Fairbanks, Alaska, for appellee.

Before BARNES, KOELSCH, and BROWNING, Circuit Judges.

BROWNING, Circuit Judge:

The appellants, Mr. and Mrs. Hoopes, brought this action under section 4 of the Clayton Act, 15 U.S.C. § 15, against the Union Oil Company of California to recover treble damages for injuries allegedly resulting from violation of the antitrust laws, "including but not limited to" sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13. Two additional causes of action were alleged but are not at issue here.

After answer, partial discovery, and other pretrial proceedings, both sides moved for summary judgment on the antitrust claim. The district court granted Union's motion on the ground that appellants "lacked standing to sue * * for the reason that under the facts of this case they are not persons injured in their business or property by reason of anything forbidden in the anti-trust laws within the meaning of 15 U.S.C.A. § 15." [1] The district court determined there was no just reason for delay and directed entry of judgment. Rule 54(b), Fed.R.Civ.P. This appeal followed. We reverse.

The business history which climaxed in this suit may be briefly summarized as follows.

In 1945 appellants built a garage and service station on two lots which they owned in Fairbanks, Alaska. For a period of ten years, until late in 1955, the premises were operated as a Union station under "lease and leaseback" agreements between appellants and Union.

In the fall of 1955 Victor D. Hart expressed an interest in purchasing the service station from appellants. Negotiations involving appellants, Union, and Hart resulted in the execution on December 21, 1955, of the following related agreements.

Appellants and Union executed an instrument cancelling their "lease-leaseback" agreement on the property, which then had five and a half years to run.

■ Appellants contracted to sell the property to Hart. Hart paid appellants a down payment, borrowed from a bank, and executed "mortgages" on the real and personal property to secure the loan. Union arranged with the bank for the loan to Hart, and agreed to satisfy the "mortgage" by payments to the bank of one cent on each gallon of Union gasoline sold by Hart at the station. [2]

Hart "leased" the property to Union for a term of fourteen years, ending December 31, 1970, Union agreeing to pay Hart "rent" of 1½ cents on each gallon of its own gasoline sold at the station. Hart "assigned" these rental payments to the bank to be applied to the down payment loan. Union "leased" the property back to Hart for the same fourteen-year term, Hart agreeing to pay Union "rent" of 1½ cents per gallon on all gasoline sold at the station, regardless of brand. Hart's "lease" to Union was terminable only at Union's option and on the occurrence of specified events affecting

---

1. Section 4 of the Clayton Act, 15 U.S.C. § 15 reads:

 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

2. Appellants allege that this one-cent payment constituted a discount or "kick-back" to Hart which was not given in equal amount to other service station operators, and that this and other Union practices reflected price discrimination violating 15 U.S.C. § 13(a). As we read the allegations, these practices are attacked as among the means allegedly employed by Union to effectuate its program of exclusive dealing, and we do not consider the problems which would be raised if they stood alone. See note 6.

 Since appellants' price discrimination allegations appear relevant on the theory suggested, we think the district court erred in barring discovery as to this issue.

the usefulness of the premises as a service station. Union's "leaseback" to Hart was terminable by either party without cause on seven days' notice.

Appellants executed a "consent clause," attached to the Hart-Union "lease," by which appellants agreed that if they acquired possession of the premises before the "lease" expired, Union would be entitled to possession for the remainder of the fourteen-year lease.

Hart took possession of the property under this series of agreements, and operated it until August 9, 1956. On that date Hart "subleased" the station to two other individuals, Mr. Schroeder and Mr. Wisel. On April 1, 1957, Hart "subleased" the station to a corporation, Transfare, Inc., which he formed with the same two individuals. Both of these "subleases" were made with the consent of Union, and appellants allege that Union required the "sublessees" to agree to the same arrangements as existed between Union and Hart.

The business did not prosper, and on May 19, 1958, Hart and Transfare, Inc. quitclaimed their interests back to appellants. Appellants then leased the premises to Transfare, Inc., at an agreed monthly rental for a five-year term. "Rental" payments to Union under the Union "leaseback" to Hart were discontinued.

At this juncture Union gave notice of Hart's default under the "leaseback" and demanded that appellants (and Transfare, Inc., appellants' lessee) relinquish possession of the premises under the "consent clause" to the Hart-Union "lease." Upon appellants' refusal, Union filed suit in the Alaska state courts seeking, among other things, to enforce its alleged right to possession, and to require appellants to pay off the balance

due on Hart's obligation to the bank secured by the "mortgages" on the premises.[3]

On April 30, 1961, while the state court action was pending, Transfare, Inc., surrendered the premises to appellants. Appellants allege that they then tried to sell or lease the station but their efforts were frustrated by Union, which informed prospective purchasers and lessees that it held a valid fourteen-year lease on the station and threatened appellants with suit for an injunction if they persisted in their efforts to sell the property or lease it.

On April 11, 1962, the state court entered judgment denying Union relief. The court held that Union was not entitled to possession because the various agreements executed by appellants, Union, and Hart on December 21, 1955, were not intended to and did not create a landlord-tenant relationship. The court further held that appellants had not agreed to guarantee the down payment loan or to "mortgage" the premises to secure it, and that Union had no interest in the property in the nature of a "mortgage" or otherwise.

The state court found that the "lease-leaseback" agreements constituted a "requirements" contract intended "to bind the owner-operator to Union's product, as well as to impose a sanction in order to maintain an exclusive outlet for Union's gasoline," and that the "consent clause" to the "lease," signed by appellants, was "part and parcel of Union's objective of maintaining its exclusive outlet by a continued binding of the owner-operator of the subject premises to a requirements contract." The state court found that "Union desired to tie-up the subject premises to maintain an exclusive outlet for the sale of its gasoline,"

---

3. The facts thus far stated are taken from the state court's findings in this litigation.

The parties agree that these findings of fact, and others later recited in this opinion, were necessary to the state court judgment, and are binding upon them.

The state court also held that the "lease-leaseback" arrangement "would

not probably foreclose competition in a substantial line of commerce affected throughout the area of effective competition." But the parties also agree that this finding was not necessary to the state court's judgment, and is therefore not binding.

and that "Since the date of the alleged breaches by defendants and the inception of this litigation to the date of trial, Union has received of defendants precisely the object of the overriding intent of Union throughout this transaction, and that is that since the alleged breaches to the date of trial, Union's, and only Union's, gasoline has been sold from defendants' premises."

After the state court decision, Union took the position that although it was not entitled to possession of the station it "had a valid requirements contract with respect to this property," and therefore "for the term of this requirements contract (i. e., until December 31, 1970), Union Oil products must be used in the premises." Appellants allege that by advancing this claim, coupled with a warning that the premises were subject to a valid "mortgage," [4] Union frustrated negotiations between appellants and various prospective purchasers or lessees subsequent to the state court decision. Appellants allege that such incidents occurred in or about June, September, and October of 1962, and February of 1963.

The complaint in the present action was filed January 18, 1963. It alleges that Union sells in excess of 40 per cent of the petroleum products sold in the Fairbanks metropolitan area and in the State of Alaska as a whole, and occupies a dominant position in the marketing of petroleum products in those areas. The complaint details Union's conduct which resulted in the exclusion of all but Union products from appellants' service station. The complaint charges that Union pursued a similar course of action with respect to "numerous" other service station owners and operators, and thereby required them to maintain their service stations as exclusive outlets for Union's products. It alleges that Union acted for the purpose and with the effect of foreclosing competition in a substantial line of commerce, and that its conduct violated the antitrust laws. The complaint charges that by reason of Union's acts appellants were unable to operate a service station on the premises or to sell or lease the property for that purpose from the time the station was vacated by Transfare, Inc., on April 30, 1961, and that appellants thereby suffered damage, through loss of rental income from the property and diminution of its value, in the amount of $50,000.

I

Union relies upon a number of cases (particularly Harrison v. Paramount Pictures Inc., 115 F.Supp. 312 (E.D.Pa. 1953), aff'd 211 F.2d 405 (3d Cir. 1954), and Melrose Realty Co. v. Loew's Inc., 234 F.2d 518 (3d Cir. 1956)),[5] which Union reads as holding that a lessor may not recover damages under 15 U.S.C. § 15 for injuries resulting from a violation of the

---

4. As we have noted, text at note 3, the state court found that no interest in the property superior to appellants' interest was created by the "mortgage" executed on December 21, 1955 by Hart.

Moreover, appellants' second cause of action in the present suit alleged that the claims based upon the "lease-leaseback" arrangements and the "mortgages" were "wrongfully and maliciously asserted and are without any right whatever." On April 17, 1963, the district court granted partial summary judgment in appellants' favor as to this cause of action, holding that there was "no genuine issue of any material fact" with respect to liability, and that the only issue was that "of damages claimed as a result of wrongful and unlawful actions on the part of [Union] in asserting such claims."

5. See also Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389 (S.D.N.Y.1939), aff'd 113 F.2d 114 (2d Cir. 1940). But see Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956); Congress Bldg. Corp. v. Loew's Inc., 246 F.2d 587 (7th Cir. 1957); and Sandidge v. Rogers, 256 F.2d 269 (7th Cir. 1958). And compare also decisions allowing recovery for damages resulting from intentional and unprivileged interference with plaintiffs' existing or prospective contractual relations with others, particularly cases collected in Prosser on Torts 960 nn. 20–32 (1964). See also Harper & James, Torts 499, 502–03, 511–13; 2 Callmann, Unfair Competition 585 (1950); 4 Restatement, Torts § 766.

antitrust laws directed against the lessee, because as to the lessor such injuries are "remote," "indirect," or "incidental." [6] As this court and others have noted,[7] language in a number of Supreme Court opinions [8] casts doubt upon these and other restrictive "judicial glosses" [9] upon the broad language of the Clayton Act § 4, 15 U.S.C. § 15. Be that as it may, the relationship between Union's violation and appellants' injury disclosed in this record satisfies all of the formulations of the statute's requirements suggested by any decision of which we are aware, including those relied upon by Union.

The gist of appellants' charge is that Union sought to restrain competition by restricting a substantial number of retail outlets, including appellants' service station, to the sale of Union gasoline. The alleged purpose and effect of Union's course of conduct was to foreclose competitive sales through appellants' service station. Appellants, as the owners of that property, were the key to its control, and they were the direct and primary objects of the means by which Union undertook to accomplish its purpose. Appellants' contract vendee, the successive lessees, and the various potential lessees and purchasers of the property from appellants were objects of Union's attention only as this became necessary to the imposition and enforcement of the desired anticompetitive condition upon the use of the property itself.

 Union's allegedly illegal conduct was thus "aimed" at restricting the use of appellants' property. Appellants and their property were within the "target area" of that conduct—"the area which it could reasonably be foreseen would be affected" by the antitrust violation. Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 220 (9th Cir. 1964). See also Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 362–364 (9th Cir. 1955); Conference of Studio Unions v. Loew's Inc., 193 F.2d 51, 54–55 (9th Cir. 1951). Appellants' claim was not "derivative," for they sued for damages sustained by themselves and not by their tenants or others. Their injuries were "direct" for they arose out of appellants' own relationships with Union—reflected in the "consent clause," the state court litigation, and Union's successful efforts to prevent appellants from leasing or selling the premises free of the restrictive condition. Appellants' injuries were not "consequential" or "secondary," for they did not result from injury to third persons. They were not "remote," for they were the immediate result of the illegal conduct, without intervening cause. Congress Bldg. Corp. v. Loew's Inc., 246 F.2d 587, 592–594 (7th Cir. 1957); Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190, 192–193 (9th Cir. 1956); Productive Inventions v. Trico Prods. Corp., 224 F.2d 678, 679 (2d Cir. 1955); Conference of Studio Unions v. Loew's Inc., supra, 193 F.2d at 54–55.

Imposition of liability for such damages clearly serves the statute's purposes. South Carolina Council of Milk Producers v. Newton, 360 F.2d 414, 418–419 (4th Cir. 1966); Karseal Corp. v. Richfield Oil Corp., supra, 221 F.2d at 365; Conference of Studio Unions v. Loew's Inc., supra, 193 F.2d at 54–55; 64 Colum.L.Rev. 570, 587 (1964); 57 Nw. L.Rev. 691, 707 (1963).

---

6. Union also relies upon authority which it reads as denying appellants standing to sue for damages resulting solely from alleged price discriminations in favor of, or against, appellants' lessees. The record does not present that question. See note 2.

7. South Carolina Council of Milk Producers v. Newton, 360 F.2d 414. 418 (4th Cir. 1966); Harman v. Valley Nat'l Bank, 339 F.2d 564, 567 (9th Cir. 1964); Congress Bldg. Corp. v. Loew's Inc., 246 F.2d 587, 592 (7th Cir. 1957); 64 Colum.L.Rev. 570,. 587 (1964); 41 Wash.L.Rev. 174, 179–80 (1966).

8. Particularly Radovich v. Nat'l Football League, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); and Radiant Burners v. Peoples Gas & Light Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed. 2d 358 (1961). See also Guilfoil, 10 Antitrust Bull. 747, 776 (1965); Note, 69 Harv.L.Rev. 575, 576 (1956).

9. 64 Colum.L.Rev. 570, 585 (1964).

It is no bar to recovery that appellants were not competitors of Union, or that appellants' injuries did not result from the allegedly illegal restraint upon the marketing of petroleum products but rather from the means which Union used to accomplish that restraint. Radovich v. Nat'l Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); United Copper Sec. Co. v. Amalgamated Copper Co., 232 F. 574 (2d Cir. 1916). "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Neither does it immunize the outlawed acts because they are done by any of these. * * * The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948).

## II

Union argues that the judgment should be sustained on an alternate ground, urged upon the district court but not reached, that appellants' antitrust claim is barred by the four-year statute of limitations. 15 U.S.C. § 15(b). Union reasons that appellants' cause of action rests upon the "lease-leaseback" agreements executed December 21, 1955; that the last act causing injury which could conceivably involve Union was its consent to the assumption of the obligation of these agreements by Mr. Schroeder and Mr. Wisel and later by Transfare, Inc.; and that the operative force of this consent expired no later than May 18, 1958, when Hart and Transfare quitclaimed their interests to appellants.

Union views appellants' claim too narrowly. The alleged antitrust violation consists of Union's entire course of conduct directed to the establishment and maintenance of exclusive dealing arrangements with service station outlets in Fairbanks and other Alaska areas. Acts of Union in furtherance of this purpose, which appellants contend caused them injury and damage, included Union's efforts to prevent appellants from selling or leasing their station free of the exclusive dealing condition. These acts continued until the complaint was filed and thereafter. Thus, appellants' action is not barred even if the invasion of their interests is considered to have been episodic rather than continuous. See generally Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190, 194–195 (9th Cir. 1956); Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 731–732 (8th Cir. 1964).

## III

Appellants contend that the district court erred in denying their motion for summary judgment on the issue of liability. We do not agree. Exclusive dealing arrangements are not *per se* illegal. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 333, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). It cannot be determined on the present record that Union's use of such arrangements was accompanied by such a purpose, or had such a probable effect, as would require their condemnation under the antitrust laws. See generally Lessig v. Tidewater Oil Co., 327 F.2d 459, 467–469, 474–475 (9th Cir. 1964).

Reversed.