**SCM CORPORATION, Plaintiff-Appellee,**

v.

**RADIO CORPORATION OF AMERICA, Defendant-Appellant.**

**No. 351, Docket 31967.**

United States Court of Appeals Second Circuit.

Argued June 17, 1968.

Decided Jan. 9, 1969.

Certiorari Denied June 9, 1969.
See 89 S.Ct. 2014.

John F. Sonnett, New York City (William K. Kerr, Lawrence J. McKay and David R. Hyde, New York City, of counsel), for appellant.

Frank F. Scheck, New York City (Pennie, Edmonds, Morton, Taylor & Adams, New York City, of counsel), for appellee.

Before MOORE and HAYS, Circuit Judges, and TIMBERS,* District Judge.

MOORE, Circuit Judge:

Radio Corporation of America (RCA), defendant, appeals from a judgment dismissing its second counterclaim against SCM Corporation (SCM), plaintiff. Upon motion on the pleadings to dismiss the second counterclaim and to strike the second affirmative defense, the counterclaim was dismissed and the defense was stricken. Judgment was entered pursuant to Rule 54(b), F. R. Civ. Proc. Some background of the pleadings is essential to a determination of this appeal.

*The Second Amended Complaint*

SCM's "First Cause of Action" is "for a declaratory judgment that United States Patents Nos. 2,922,883, 3,052,539, and 3,052,540" owned by RCA are invalid and not infringed by SCM. The patents relate to electrostatic photocopy machines and supplies therefor including the paper used herein. SCM manufactures and sells such machines and paper. RCA claims that this constitutes an infringement of its patents.

The "Second Cause of Action" is for restitution to SCM of royalties paid to RCA under the patent license agreement covering Patent No. 3,052,539 ('539) between March 1, 1963 and April 4, 1964 because of alleged fraudulent representations by RCA.

The "Third Cause of Action" is for violation of § 2 of the Sherman Act in that RCA allegedly has illegally monopolized, and has attempted to illegally monopolize, interstate commerce in the electrostatic photocopy field by asserting its Patent '539 in a licensing program, which patent was obtained by fraud.

To these causes of action, RCA filed denials, in substance, and alleged two af-

firmative defenses to the second and third causes of action, namely, failure to state a claim and unclean hands. Two counterclaims are pleaded, the first, seeking an injunction against continued infringement by SCM, the second, demanding treble damages under §§ 4, 12 and 16 of the Clayton Act, § 2 of the Sherman Act, § 3 of the Clayton Act, and an injunction against the practices complained of.

■ The trial, presumably on SCM's three causes of action and RCA's first counterclaim, has been concluded and is pending undecided. Decision therein should determine—at least initially—the validity or invalidity of the patents and such relief, including injunctive, if any, as should flow therefrom. At this juncture, the second counterclaim stands as a separate antitrust suit and must be so considered because as the court below has said: "that the defendant has asserted its antitrust charges in a counterclaim rather than in an independent action is immaterial, as far as the legal sufficiency of those charges is concerned."

*The Second Counterclaim*

RCA alleges that it is the owner of the three patents referred to as the "Electrofax patents"; that it is "the sole lawful monopolist of the Electrofax process"; that it has never engaged in the manufacture or sale of Electrofax machines or paper, but has chosen instead to offer and grant publicly non-exclusive licenses under its patents; that it received royalties measured by the use of the licenses; and that it has granted more than 150 licenses of which 63 are now in effect.

[These figures must be qualified by a stipulation between the parties for "the purposes of defendant's appeal" that during the years 1954 through 1962, RCA had as many as 133 licenses under its Electrofax patents and applications therefor and that during said period "not more than four of such li-

---

* Chief Judge, District of Connecticut, sitting by designation.

censees operated under their licenses and paid any royalties to RCA"; that during 1962 (when '539 was issued), RCA had 20 licensees, 4 of which operated under, and paid royalties pursuant to, licenses and 16 did not operate or incur royalty obligations; and that in 1965, when this action was begun, RCA had 40 licensees of which 26 paid royalties and 14 did not operate or incur any royalty obligation.]

Under *"The Offenses Charged,"* RCA specified that beginning in 1959, SCM sold Electrofax machines on the unlawful condition that the purchaser not buy or use goods of an SCM competitor in violation of § 3 of the Clayton Act (Compl., par. 53); that prior to 1959 SCM hired, and induced breach of contract by, personnel of its prospective competitors and licensees, which employees were knowledgeable in the Electrofax field and that SCM in 1961 acquired the assets of an RCA licensee (par. 54); that by 1963 SCM had obtained 40% of the sales of Electrofax machines and 100% of Electrofax liquid copiers, thus acquiring a monopoly (par. 55); that 58% of the Electrofax liquid copiers in use are SCM manufactured (par. 56); that SCM does not manufacture Electrofax paper but purchases it from RCA licensees (par. 57); that SCM has required its lessees to deal with it on its terms as to service, purchase of paper from competitors and by exacting restrictive covenants from employees (par. 58); that SCM is the principal and dominant seller of Electrofax paper in the United States (par. 59); and that SCM has more than a 300% mark-up in its sales of Electrofax paper (par. 60).

Under the sub-head "With Respect to RCA," RCA, after asserting in a conclusory manner SCM's actions as a "monopolist" so as to "confront RCA with a market dominated by only one possible licensee of its patents," sets forth a series of abortive demands and counter-demands with respect to the short-lived license agreement (Patent '539) between RCA and SCM, culminating in termination and this suit. Money damages (trebled), legal expenses and injunctive relief are sought (pars. 61–74).

*The Opinion Below*

In analyzing section 4 of the Clayton Act, the district court found as to damage that the key words of the statute were "by reason of." The court then held that RCA's actual injury resulted from the loss of royalties which it would have received but for SCM's termination of the license; that there was no causal connection between SCM's alleged monopoly and the loss of royalties; and that whether or not SCM can manufacture Electrofax machines with impunity without a license must depend on the outcome of the patent litigation. The court concluded that the second counterclaim does not allege facts sufficient to give RCA standing to sue because of Sherman and Clayton Act violations either for treble damages or for injunctive relief. Accordingly, the court dismissed the second counterclaim.

At the heart of all the claims and counterclaims is the question of patent validity. If the patents are invalid, the claims based thereon must fail and the resultant damages will be calculated in the light of such findings. If, on the other hand, the patents are valid and SCM has infringed, different consequences will naturally follow.

Upon the facts pleaded (and assumed to be true) and as a matter of law, the court concluded that "the second counterclaim does not allege facts which confer upon defendant standing to sue for plaintiff's alleged violations of the Sherman Act and the Clayton Act, either for treble damages or for injunctive relief." The court relied heavily upon the doctrine of "direct," not "incidental" injury expounded in this circuit in Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2 Cir. 1955). In that case, the patentee, Productive Inventions, had granted an exclusive license to a company (Anco) to manufacture and sell windshield wipers under its patents. Productive Inventions' sole interest in

the patents was limited, as is RCA's interest here, to the right to receive royalties. Productive Inventions brought suit against Trico, a competitor of its licensee (Anco), claiming that it (Productive Inventions) had suffered a direct injury—loss of royalties—as a result of Trico's demands that purchasers of its products not deal with Trico's competitors, including Anco, thus reducing Anco's royalty payments to Productive Inventions. This court posed the question: "Is a patentee who has granted to another an exclusive license for the term of the patent, upon a royalty basis, a 'person * * * injured in his business or property' (within the meaning of Section 4 of the Clayton Act) so as to enable him to recover treble damages for loss of royalties on sales that might have been made by its licensee save for the anti-trust violations of defendant?" This court held that he is not. Specifically, the court said that the "appellant [Productive Inventions] has no standing under the anti-trust laws to complain of the incidental loss of royalties by activities of Trico, not directed at it" (p. 680). The court, however, conceded that "No hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity."

Applying the principle enunciated in *Productive Inventions*, the district court concluded "Assuming the factual allegations of the counterclaim to be true, the victims of plaintiff's antitrust violations, the people in the 'target area,' are plaintiff's competitors, the manufacturers of Electrofax machines and paper. Defendant, as a patent owner, no matter how important its patents may be, is only incidentally affected. The injury which it has suffered because its 63 licensees have suffered is not, under the authorities, an injury which gives it standing to sue." An *a fortiori* situation would seem to be presented here where RCA still has 63 licensees whereas Productive Inventions had only one.

The nature of the injunction sought by RCA is revealing because it indicates the proper territory for an antitrust suit, if any be justified, and conversely, shows that such a suit on the facts alleged, does not lie between RCA and SCM. The acts sought to be enjoined relate to alleged impositions placed by SCM upon SCM's customers, suppliers or lessees. Insofar as RCA seeks to protect itself from allegedly illegal demands or solicitations by SCM, injunction upon the facts pleaded is scarcely the remedy. Thus, the proper parties to any suit under the antitrust laws would appear to be SCM and its customers, suppliers or lessees. If any of this group were injured by SCM's exactions, assuming that they contravened the law, the suit would then be by a party directly injured "by reason of" such violation.

In this case, the best antitrust suit illustration is not hypothetical, but is to be found in the recently decided case of Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143, D.Md. 1968. This was a private antitrust suit against SCM wherein the plaintiff, engaged in the sale in the State of Maryland of paper and supplies for use in SCM and other copying machines, complained that SCM by unfair and restrictive trade practices (not unlike the charges here) had caused it injury by reason of violations of §§ 1, 2 of the Sherman Act, and § 3 of the Clayton Act. The Court in a lengthy opinion carefully and thoroughly analyzed the facts as related to the issues including "the relevant market." No purpose would be served by trying to transpose the facts of that case to the allegations here. The Court found in favor of SCM on many issues; against it on some. The point of the case is that it illustrates the district court's comment here that, assuming the factual allegations to be true, "the victims of plaintiff's antitrust violations, the people in the 'target area,' are plaintiff's competitors, the manufacturers of Electrofax machines and paper."

The district court has recognized that RCA by way of counterclaim may invoke the protection of the antitrust laws.

This recognition, however, does not mean that the conclusory allegations presented constitute a valid antitrust action. The counterclaim is replete with charges that SCM "attempted unlawfully to monopolize," that "the effect of which [act vis-à-vis SCM's customers] may be to tend to create a monopoly," that SCM is "the principal and dominant seller," that SCM "has unlawfully acquired a dominant position in the markets," and that SCM "attempted to and has acted as a monopolist." These are very impressive conclusory charges and must be examined in the light of the modern notice-pleading of the day. But even this enlightened renunciation of "old-fashioned" pleading ought to permit the query: notice of what?

The answer is to be found in RCA's allegation that "As a result of the offenses alleged above, RCA [as the lawful owner of the patents] has been immediately injured * * *, in that RCA has been wilfully and maliciously deprived of royalties lawfully due * * * [under Patent '539] and has been put to the burden and expense of defending this law suit." Injunctive relief is sought on the theory that RCA has been prevented from enjoying the full benefits of its patents and, in effect, would have prospered "but for" SCM's acts.

RCA contends that SCM's monopolization "if successful" will deprive it of the fruits of licensing, that "even if SCM must pay some royalty, if it is the only available licensee," SCM might insist on a smaller royalty, that "if that event comes to pass, RCA would be 'directly' injured"; and that RCA seeks only to avoid threatened loss "if the threat materializes" (RCA reply brief).

■ After searching for factual allegations which might bring this counterclaim within the purview of the antitrust laws, it is difficult to escape the conclusions reached by the district court: (1) "The injury which it [RCA] has suffered because its 63 licensees have suffered is not, under the authorities, an injury which gives it standing to sue"; and (2) "The other injury

which it has sustained, its loss of royalties and its litigation expense, is not an injury which it has sustained by reason of plaintiff's antitrust violations. This is an injury which defendant has suffered because plaintiff challenged its patents, whether justifiably or not remains to be seen. As to that injury, plaintiff's violations and its alleged monopolistic position are irrelevant."

RCA relies on such cases as Osborn v. Sinclair Refining Co., 324 F.2d 566 (4th Cir., 1963); Dairy Foods Incorporated v. Dairy Maid Products Corp., 297 F.2d 805 (7th Cir., 1961); Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3rd Cir., 1966); Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Congress Building Corp. v. Loew's Inc., 246 F.2d 587 (7th Cir., 1957); Hoopes v. Union Oil Co. of California, 374 F.2d 480 (9th Cir., 1967); So. Carolina Council of Milk Producers, Inc. v. Newton, 360 F. 2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir., 1966); and Standard Oil Co. of Calif. v. Perkins, 396 F.2d 809 (9th Cir., 1967).

As is to be expected, each of these cases presented its own particular set of facts upon which decision had to be based. *Osborn* involved the cancellation of Osborn's lease and a refusal by Sinclair to deal because Osborn refused to abide by an unlawful arrangement between Sinclair and its dealers (primarily tie-in demands). *Dairy Foods* procedurally was quite analogous—a suit for patent infringement, counterclaims for a declaration as to patent validity, and a treble-damage antitrust claim. There were allegations of the unlawful pooling of patents by the plaintiff and others, coercion to accept illegal licenses under threat of infringement suits, and the use of such suits to place Dairy Maid under "conspiratorial compulsion."

*Jones Knitting* was fundamentally a patent infringement suit, but the plaintiffs had formed a "group" not only to

challenge the validity of the Morgan patent, but also to engage in a "group boycott" in violation of § 1 of the Sherman Act. When the Court of Appeals reversed a determination of patent invalidity, naturally the remand required an assessment of such damages as resulted from the boycott.

*Perma Life Mufflers,* as said in the majority (Mr. Justice Black) opinion, presented as the "principal question" whether plaintiffs were barred by the doctrine of *in pari delicto.* The Court granted certiorari because the lower court rulings "seemed to threaten the effectiveness of the private action as a vital means for enforcing the antitrust policy of the United States" (392 U.S. 134, 136, 88 S.Ct. 1981, 1983). The Court held that the *in pari delicto* doctrine was not a defense, but did not write the "by reason of" clause out of the statute. Mr. Justice White in his concurring opinion specifically stated that not only a violation must be shown but also under section 4 a plaintiff must establish "that his [defendant's] conduct caused the damages alleged in the complaint" (p. 143, 88 S.Ct. p. 1987). Justices Fortas and Marshall, although concurring, took somewhat different positions as to *in pari delicto* as did Justices Harlan and Stewart in Mr. Justice Harlan's concurring and dissenting opinion. The *Perma Life Mufflers* decision is quite inapplicable here.

In South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir., 1966), the court recognized the principles of *Productive Inventions* and that "The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury" (p. 419), but concluded that the complaint stated sufficient facts to require a trial. There, although there were no direct transactions between plaintiffs and defendants, the defendants allegedly conspired to sell processed milk below cost which seriously affected the plaintiffs' raw milk sales and prices.

Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir., 1966) involved the standing to sue of two of the six plaintiffs. The court found as a matter of fact (there had been a jury trial) that there was sufficient proof of direct injury and the necessary causal connection between injury and the defendants' antitrust violations.

In Hoopes v. Union Oil Company of California, 374 F.2d 480 (9th Cir., 1967), the court found that the plaintiffs' injuries were "direct" and not "consequential," "secondary," or "remote." Thus, it held that Union's allegedly illegal conduct was "aimed" at appellants and that appellants were within the "target area."

The Supreme Court has said that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws" (Perma Life Mufflers, 392 U.S. p. 139, 88 S.Ct. p. 1984). But the "private action" is created by section 4 of the Clayton Act, 15 U.S.C. § 15. Standing to sue was not given by Congress to any and every citizen who, motivated by public spirit or possibly some baser reason, would set himself up as a watchdog of business behavior. Congress properly bestowed the right to sue only on such persons as might be injured in their business or property *by reason of* anything forbidden in the antitrust laws.

RCA is not foreclosed from seeking treble damages or injunctive relief if it can plead, and establish by proof, the causation required by the statute. All that the district court decided was that "the second counterclaim does not allege facts which confer upon defendant standing to sue for plaintiffs' alleged violations of the Sherman Act and the Clayton Act." This is all that we affirm.

Affirmed.

TIMBERS, District Judge (dissenting):

I dissent.

It is quite true that a distinction has been drawn limiting the right to bring actions under the antitrust laws to those who have been directly, as opposed to indirectly, injured by anticompetitive activity. But Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2 Cir. 1955), cert. denied, 350 U.S. 936 (1956), recognized that no hard and fast rule could be laid down, and the decision was specifically limited to the facts there presented. Furthermore, the very validity of *Productive Inventions* has been cast in some doubt by comments of the Supreme Court in such cases as Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 660 (1961), and Radovich v. National Football League, 352 U.S. 445, 454 (1957). See Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y.1967) (Weinfeld, J.).

With this in mind, I think a viable distinction exists between the facts as stated by this Court in *Productive Inventions* and the facts here.

In *Productive Inventions* the relevant market apparently was assumed to be windshield wipers and their components. Trico's participation in that market was by virtue of its own devices and patents; while, by exerting monopoly power over appellant's licensee, Trico might have eliminated appellant as a competing patent licensor, there is no indication that this was the thrust of appellant's claim. Therefore, viewing appellant's claim as simply one arising out of a possible loss of royalties, we concluded that Trico's activity was not aimed at appellant and appellant could not maintain an action.

In the instant case, on the other hand, RCA alleges the relevant market and submarkets to be limited to Electrofax machines and paper, areas covered by its patents. Assuming as we must that these market definitions are correct and also assuming the validity of the patents, then SCM has much to gain from RCA by eliminating the other licensees. SCM's position in the market rests on the use of RCA patents. By eliminating the licensees, SCM places itself in a position vis-à-vis RCA where it can make its own demands with respect to use of the patents. In fact, SCM did make such demands; and, despite Judge McLean's conclusion that RCA did not succumb to these demands, RCA should not be precluded from seeking injunctive relief. The protection of the antitrust laws should not be withheld from a patentee where it is endeavoring to maintain a system of non-exclusive licensing. While it may be true that a misbehaving licensee such as SCM may be eliminated by the termination of the licensing agreement, the patentee should not be put to the choice of such termination or the alternative of assenting to the licensee's demands. It is an untenable choice and one not in the public interest. See Dairy Foods, Inc. v. Dairy Maid Products Corp., 297 F.2d 805 (7 Cir. 1961).

All of the cases relied on in *Productive Inventions* were brought by unions, shareholders, creditors, directors, officers or landlords alleging antitrust violations against their employers, companies or tenants. In not one of these cases was it alleged that the anticompetitive action was taken with the specific aim of harming the plaintiffs. Indeed the defendants in these suits would have no reason to act against the plaintiffs.

The cases after *Productive Inventions* which have cited it with approval have been of a similar nature. All have involved antitrust activity which, while perhaps resulting in real injury to the plaintiffs, was not carried on for the purpose of injuring them. See, e.g., Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292 (2 Cir. 1958).

SCM asserts that RCA is at best a supplier to its licensees of immunity from patent infringement suits which might be brought by itself, and then cites Productive Inventions, Inc. v. Trico Products Corp., supra, Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.

2d 383, 393–95 (6 Cir. 1962), cert. denied, 372 U.S. 907 (1963), and Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass.1956), for the proposition that suppliers cannot bring actions to recover for injuries sustained through antitrust activities against those they supply. But as with *Productive Inventions*, the suppliers in the latter two cases were not the intended victims of the anticompetitive activity of the defendants. If RCA is but a supplier, it is also the supplier to SCM, and it is for the purpose of altering their relationship, to the benefit of SCM and to the detriment of RCA, that SCM has acted to deter competition.

Therefore, to me the conclusion is inescapable that RCA suffered sufficient injury even prior to SCM's termination of the licensing agreement and institution of the action to permit RCA to maintain its claim for injunctive relief.

I would also hold that Judge McLean erred in determining that RCA's loss of royalties and its litigation expenses were not, as a matter of law, a result of SCM's anticompetitive activities. Admittedly there are many problems in this respect, particularly the obvious desirability of not discouraging challenges to claimed patent rights where appropriate. See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172 (1965). Nevertheless, I fail to see why the termination of a licensing agreement and institution of a patent suit may not be part of an anticompetitive plan despite the seeming "cut - off - your - nose - to - spite - your-face" result upon which Judge McLean focused. For example, RCA in its brief points out that SCM has used the period since termination of the agreement, during which it has paid no royalties, further to eliminate and discourage other licensees. Therefore, where a party can show that such action was part of a plan to monopolize, and not simply an assertion of claimed legal rights, that party should be entitled to recover whatever additional damages the antitrust laws provide over what the patent laws permit. I would therefore leave appellant to its proof on this issue.

For the reasons stated, I would reverse and remand for trial on RCA's antitrust counterclaim in the pending patent suit.[1]

---

1. Since the only issue on this appeal is the correctness of the District Court's dismissal before trial of RCA's second counterclaim, I recognize the anomaly of our ruling on that issue now that the trial of the rest of the case, absent the second counterclaim, has been concluded. N.Y. L.J., Oct. 9, 1968, p. 21, col. 1. For whatever reason, counsel proceeded with the trial while this appeal was pending. The majority opinion is addressed to the record as it stood when the appeal was argued on June 17, 1968, as likewise is this dissent.