**CITIES SERVICE OIL COMPANY,**
Plaintiff-Appellee,

v.

**COLEMAN OIL COMPANY, INC.,**
Defendant-Appellant.

No. 72–1250.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1972.

Decided Dec. 19, 1972.

Samuel H. Borenkind, New York City, with whom Sanderson & Dudley and David Sanderson, Portsmouth, N. H., were on brief, for appellant.

Ronald L. Snow, Concord, N. H., with whom Neil F. Castaldo and Orr & Reno, Concord, N. H., were on brief, for appellee.

Before COFFIN, Chief Judge, and Mc-ENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This appeal involves the validity of seven gasoline service station leases between appellant, Coleman Oil Company (Coleman) and plaintiff, appellee, Cities Service Oil Company (Cities). Since 1941 appellant has acted as a wholesale distributor of oil products manufactured by Cities, receiving payment from the latter on a commission basis. In conjunction with this arrangement, Coleman acquired and developed numerous gasoline service station sites in the Maine-New Hampshire area, including those involved in the present litigation. While the land for these sites was acquired by Coleman with its own funds, the actual development was undertaken in cooperation with Cities. The improvements were financed in the following manner. Cities would arrange for Coleman to borrow the necessary money from a financial institution, the loan being secured by a fifteen year mortgage on the property. As collateral security for the loan, Coleman would execute and deliver to Cities a fifteen year lease, running concurrently with the mortgage, and assign the monthly rental payments to the lending institution. These rental payments were equal to the amortization and interest due on the loan. After the service stations were completed, Cities, as lessee, would sublet the premises to a retail gasoline dealer for an amount equal to its own rental obligation. The service stations sublet in this manner became exclusive outlets for the products of Cities, with Coleman acting as its wholesale distributor.

Trouble between the two companies began in December 1959 (approximately five years after the signing of the first lease) when Cities notified Coleman that effective January 15, 1960, it would directly supply its products to fifteen service stations [1] and that, as a consequence, Coleman would no longer act as its commission agent for these stations. At about the same time, a dispute arose as to the validity of six of the seven leases now in question. This dispute culminated in an action for enforcement of the leases being filed by Cities in federal district court. As part of the settlement in that action, Coleman signed a release dated December 14, 1960, specifically reaffirming the validity of these leases, including the renewal and purchase options contained therein, and a release dated February 7, 1961, waiving all defenses to any leases then existing between the parties. In return for signing these releases, Coleman received a five year renewal of its commission agreements with Cities.

In June 1971 Coleman again notified Cities that it considered the leases to be invalid, and that it would shortly evict Cities from the leased premises. On July 10 Coleman carried out its threat, and replaced Cities' identifications with those of the American Oil Company. The present action to enforce the leases followed.

At the trial, Coleman conceded that the disputed leases had been properly executed and that Cities had never violated any of their provisions. Nor did Coleman seek to challenge the intrinsic validity of the releases which it had signed in settlement of the earlier litigation. Appellant sought to avoid the seemingly inescapable effect of these concessions, however, by arguing that the releases had been signed as a result of economic duress, and that the leases were invalid as a matter of law. As to the alleged invalidity of the leases, Coleman set forth two grounds in support of its position. First, Coleman argued that the leases had never been intended to create a genuine landlord-tenant relationship, but were rather in the nature of security agreements which should have been cancelled once the mortgage debts were paid off. Secondly, it contended that the leases were in restraint of trade, and therefore unenforceable under the Sherman Antitrust Act.

At the close of the evidence, the trial court submitted the following questions to the jury:

"(1) Were the leases between the plaintiff and defendant a deliberate arrangement by the plaintiff to eliminate and stifle competition so as to prevent competitive brands of petroleum products from being sold at the gasoline service stations covered by the leases?

"(2) Was the stipulation and general release, Exhibits 2 and 3, entered into by the defendant because of duress?

"(3) What damages do you find that the plaintiff suffered because the defendant terminated the leases on July 10, 1971?

    (a) on a daily basis—

    (b) from July 10, 1971, to April 7, 1972—

    (c) none."

The jury answered the first two questions in the negative, and calculated plaintiff's damages to have been $250 on a daily basis. Following the jury's verdict, the trial court issued its Ruling and Order, which reads in part as follows:

"1. The findings of the Jury are accepted.

"2. The seven leases in issue are valid and binding on both parties.

"3. The seven leases in issue do not violate Section 1 of the Sherman Anti-Trust Act. 15 U.S.C. Sec. 1.

. . . . . . .

"5. The defendant is permanently enjoined from interfering, directly or indirectly, with the plaintiff's use of

---

1. These fifteen service stations included six of the seven sites currently in dispute.

the seven leased premises in accord with the terms and conditions of the leases and is ordered to specifically perform all of its obligations and responsibilities under the leases. . . .

"6. The plaintiff shall be entitled to damages at the rate of $250 per day, plus interest and costs from July 10, 1971, to date of final entry of judgment."

Coleman appeals from this decision, asserting the same grounds for finding the leases invalid as it advanced below. It also objects to the trial court's admission of certain testimony relating to damages, and to the overall sufficiency of the evidence on that issue. We find appellant's contentions to be without merit, and accordingly affirm the judgment of the district court.

The first obstacle which Coleman faces on this appeal, and one which we find to be insuperable, is the matter of the releases which it signed in late 1960 and early 1961. These releases were executed in settlement of a suit involving six of the seven properties currently in dispute. The December 14, 1960, release specifically reaffirmed the validity of these leases, including the purchase and renewal options contained therein, and waived all defenses to their sufficiency which might be asserted by Coleman. The February 7, 1961, release contained a similar waiver of defenses as to all leases then existing between the parties. As of the signing of this second agreement, all seven leases involved in the present case had been executed.

■■ There is an obvious public policy favoring the amicable settlement of litigation, and agreements accomplishing this result will be disregarded only for the strongest of reasons. The appellant argued before the district court, and now seeks to argue on appeal, that the releases were signed as a result of the irresistible economic pressure which Cities was able to exert upon Coleman by threatening to discontinue the commission arrangements then existing between the parties. The jury, however, found against Coleman on the issue of duress,[2] and appellant has not attempted to argue that this finding was incorrect as a matter of law. Indeed, such an argument would be fruitless, since there is no evidence in the record which would have compelled a jury to conclude that the releases had been signed as a result of economic pressure. While the president of Coleman did testify in conclusory terms that his company would have been forced to go out of business had its commission agreements with Cities been cancelled, there was no indication that other, equally profitable, arrangements could not have been worked out with competing oil companies.[3] The issue of duress was a factual question for determination by the jury, and we find no reason to overturn its verdict. The releases are therefore fully binding upon Coleman, and act as a bar to the defenses it now seeks to assert. We need not rest our decision on that ground alone, however, since Coleman has advanced no sufficient reason for invalidating the controverted leases.

■ Turning first to appellant's contention that the disputed leases were somehow something other than what they clearly purported to be, we find the trial court's holding on the issue of the leases' validity to be completely dispositive. If the appellant's theory that the leases were actually intended as security agree-

---

2. We assume, without deciding, that a defense of economic duress would have been legally sustainable on the facts of this case had the jury made an appropriate finding.

3. Coleman also argues that it was forced to sign the releases because a discontinuation of its relationship with Cities would have deprived it of any return on its investments in the leased locations. The evidence was sufficient, however, to support the conclusion that Coleman had already realized a substantial return on its investment by virtue of its commission agreement with Cities, and had additionally acquired a valuable equity interest in the properties.

ments were to be accepted, the renewal and purchase options contained therein would be rendered totally meaningless. This fact alone provides more than adequate support for the court's decision.

■ Appellant also seeks to avoid the binding effect of the leases by arguing that they were in violation of § 1 of the Sherman Antitrust Act[4] and therefore unenforceable. Appellant reasons that since the leases effectively created an exclusive sales outlet for Cities, they illegally restrained free competition in the interstate distribution of petroleum

products. We need not consider whether an antitrust defense would be available to Coleman in this contract action, see Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971), since more fundamental deficiencies inhere in appellant's argument.

■ For purposes of § 1 of the Sherman Act, a contract may be an illegal restraint of trade (1) because it constitutes a *per se* violation of the statute,[5] or (2) because an unreasonable restraint of trade is either its object or

4. Coleman also argues on appeal that the leases contravened § 2 of the Sherman Act and § 3 of the Clayton Act. These sections were not raised below, and appellant is therefore precluded from relying on them here.

5. Appellant attempts to characterize the lease assignment device as an illegal tying arrangement, which should be declared a *per se* violation of the Act since a not insubstantial amount of interstate commerce was affected thereby and since appellee had a sufficient degree of economic power in the tying product. *See* Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Appellant's theory is that Cities' agreement to facilitate the construction loans through the lease assignment devices (the "tying product") was effectively made conditional upon its purchasing Cities' petroleum products (the "tied product") as sole supplier of the service stations. While appellant's argument is certainly imaginative, we do not feel that the complicated business relationships involved in this case were a tying arrangement in any real sense. The "tying product," if any, was not Cities' cooperation in the leasing arrangements, but the extension of credit by the lending institutions. Since these institutions were not subsidiaries of Cities, this case is clearly distinguishable from *Fortner, supra.* Furthermore, given that Coleman acted as a commission-basis distributor for Cities in supplying the retail operators of the leased locations, and had done so for many years before the credit was extended, for other locations in the area, we find it difficult to say that Coleman was compelled to purchase the "tied product." *Compare* Fortner Enterprises, Inc. v. United States Steel Corp., *supra*; United States v. Loew's, Inc., 371

U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Rather than being a coercive tying arrangement, the business relationship before us would appear to represent a rational and mutually profitable scheme for the development of service station sites.

Moreover, even assuming that the leases were, in fact, a tying arrangement, there is still no basis for appellant's argument that they constituted a *per se* violation of § 1. While we recognize that appellant need not demonstrate that Cities enjoyed a dominant market position in the tying product in order to invoke the *per se* standards of the Act, *see Fortner, supra,* appellant failed to demonstrate at trial that the credit terms offered by Cities were in any way unique and unusually advantageous. *Compare* In re United States Steel Corp., 41 U.S.L.W. 2267 (FTC, Oct. 19, 1972). This failure to show any market power whatever in the "tying product" is fatal to Coleman's argument that the lease arrangements constituted a *per se* violation of the statute. *Compare Fortner, supra,* at 504–505, 89 S.Ct. 1252.

Appellant also cites Hoopes v. Union Oil Company, 374 F.2d 480 (9th Cir. 1967) for the proposition that leasing arrangements of the kind involved in this case are illegal under the Sherman Act. While *Hoopes* is inapposite here for several reasons, it is important to note that the court in that case denied appellant's motion for summary judgment on the grounds that exclusive dealing contracts (to which these leases admittedly bear some resemblance) are not per se violative of the antitrust laws. 374 F.2d at 486. *See* Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.

effect. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In the present case, the jury specifically found that the leases had not been designed for the purpose of stifling free competition. Thus, since no evidence was introduced tending to show that their actual effect was to reduce competition in the relevant market area,[6] the court was clearly correct in finding no violation of the Sherman Act.

■■■ Finally, we consider appellant's claim that the evidence was insufficient on the question of damages, and that certain testimony relating to that issue was improperly admitted. Appellant first argues that the court erred in allowing the witness Tebo, an employee of Cities, to testify from the company's records as to the profits lost by the appellee as a result of its eviction from the leased locations. While conceding the general admissibility of testimony based on records kept in the regular course of business, appellant now complains that the actual documentary proof was not introduced at trial. The simple answer to this argument is that the appropriate records could have been made available for introduction into evidence upon appellant's request; its failure to make such a demand cannot now be the basis

for overturning the judgment of the district court.

■■■ Appellant also objects to Tebo's testimony concerning the fair rental value of certain equipment which Cities was deprived of during the period of its eviction from the leased service stations. Appellant argues that Tebo never qualified as an expert witness on the rental value of gasoline service station equipment, and therefore should not have been allowed to testify on this aspect of appellee's damages. This argument is made, however, without citation of authority, and we do not agree that expert testimony was essential to appellee's proof on this issue. Tebo testified as to the investment value of the equipment, and this testimony provided the jury with a sufficient basis for determining its fair rental value. While the admission of Tebo's conclusions as to the equipment's rental value was perhaps improper, we do not feel that it was sufficiently prejudicial to merit reversal, especially in view of the relatively minor proportion of plaintiff's damages which this testimony involved.

■■■ Appellant's final argument concerns the sufficiency of the evidence on the damages question. The cross examination of witness Tebo revealed that he did not know whether the cost of

---

2d 580 (1961); Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). As we note in the text, appellant has failed to establish that the lease arrangements were "accompanied by such a purpose, or had such a probable effect as would require their condemnation" under these statutes. *Hoopes, supra,* 374 F.2d at 486.

6. Indeed, the only testimony as to the effect of the leases on competition came in the cross examination of Coleman's president:

   "Q. How many different national oil and gasoline companies are represented by, would you say, by service stations in the greater Portsmouth area?

   A. Well, practically every major company doing business in the east, besides the unbranded.

· · · · ·

   Q. And, in fact, the amount of major companies represented in that area has increased since 1954 a fair amount, different brand names that are represented?

   A. Oh, yes.

   Q. And I think you would agree with me, wouldn't you, that the seven Citgo stations we are talking about here haven't kept any other competitive brands out of that area since 1954?

   A. No, they haven't.

   Q. And there is no way anyone could accuse you or the Coleman Oil Company, through the ownership of these stations, of controlling the market in the area where they are located?

   A. Well, certainly not."

**932**

crude oil to Cities, as reported in the company records used for calculating its loss of profits, had been determined in relation to the cost of the product from the well head (i. e., including the cost of refining, transportation, etc.) or by some arbitrary method which would not be reflective of the oil's true cost. Appellant argues, therefore, that Cities has not established the cost of its gasoline, and has *a fortiori* failed to meet its burden of proof on the issue of damages. Under well established rules of evidence, however, a witness may testify to the contents of records kept in the regular course of business without having personal knowledge of the facts reported therein. Tebo's lack of knowledge as to the method used by appellee in calculating its own crude oil costs merely affected the weight of his testimony, and could not vitiate either its admissibility [7] or its sufficiency to sustain plaintiff's burden of proof.

Affirmed.

---

7. We do not, of course, mean to imply that business records would be admissible where the entry was made upon information supplied by a person who did not have personal knowledge of the facts and a business duty to report them. *See* C. McCormick, Handbook on the Law of Evidence, § 286, at 602 (1954).