**AMERICAN MOTOR INNS, INC.,**
Plaintiff,

v.

**HOLIDAY INNS, INC., Defendant,**
and
**International Association of Holiday Inns, Intervenor-Defendant.**

Civ. A. No. 1623–72.

United States District Court,
D. New Jersey.

Sept. 5, 1973.

Donovan, Leisure, Newton & Irvine by Sanford M. Litvack, Paul A. Alexis, Doris K. Shaw, New York City, Pitney, Hardin & Kipp by Clyde A. Szuch, Newark, N. J., for plaintiff American Motor Inns, Inc.

Cadwalader, Wickersham & Taft by P. Jay Flocken, Washington, D.C., Wendell B. Alcorn, Eugene J. Leff, Shanley & Fisher by Harold H. Fisher, Newark, N. J., for defendant Holiday Inns, Inc.

Kaye, Scholer, Fierman, Hays & Handler by Milton Handler, Fred A. Freund, Elizabeth Head, Ira H. Block, New York City, Lowenstein, Sandler, Brochin, Kohl & Fisher by Murray J. Laulicht, Newark, N. J., for intervenor-defendant International Association of Holiday Inns.

## OPINION

GARTH,* Circuit Judge (sitting by designation as United States District Judge pursuant to 28 U.S.C. § 291(c) ):

This action was commenced by American Motor Inns, Inc. ("AMI"), a Holi-

---

* On August 29, 1973 Judge Leonard I. Garth was sworn in as a Court of Appeals Judge for the Third Circuit. On that date an order was entered by the Chief Judge of the Third Circuit designating Judge Garth as a United States District Judge for matters (including the instant opinion) not completed.

day Inns franchisee, on September 29, 1972 against Holiday Inns, Inc. ("HI"). The complaint alleges violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, basing jurisdiction upon 15 U.S.C. §§ 15 and 26. Plaintiff seeks treble damages, 15 U.S.C. § 15, injunctive relief, 15 U.S.C. § 26, a declaratory judgment, 28 U.S.C. § 2201, and such other relief as the court might deem necessary, 28 U.S.C. § 2202.

The complaint alleges more particularly that HI conspired with its franchisee at the Newark Airport, Newark, New Jersey (hereinafter "Fleck") and with unnamed others to restrain and monopolize trade in the hotel-motel lodging industry in the Greater Newark Area. It is undisputed that AMI had purchased certain property in Elizabeth, New Jersey, near the Newark Airport's new passenger terminals then under construction, for the purpose of constructing a hotel-motel facility (F 59–60).[1] The alleged antitrust violations arise, first, from HI's refusal to approve various AMI applications to build Holiday Inns, including one at the Elizabeth site, and, second, from HI's threat to enforce a clause in AMI's franchise agreement with HI which prohibits AMI from owning, operating or otherwise being associated with a non-Holiday Inn (hereinafter the "non-Holiday Inn clause"). Thus, it is alleged that AMI has been precluded from expanding by building Holiday Inns or non-Holiday Inns in the Greater Newark Area and in other areas.

Upon plaintiff's motion, this court on October 27, 1972 ordered that discovery proceed on an expedited basis, because of a continuing threat that the City of Elizabeth would revoke plaintiff's deed as a result of a failure to abide the deed's restriction that construction commence by December 30, 1972, a deadline subsequently extended for varying periods by the City.[2] On April 9, 1973, the International Association of Holiday Inns ("IAHI") was permitted to intervene as a party defendant, Fed.R.Civ.P. 24 (b)(2), on the condition that the IAHI would in no way delay commencement of the trial. Also on April 9, I denied without prejudice plaintiff's motion for partial summary judgment under Section 1 of the Sherman Act, rejecting plaintiff's contention, at that point in the case, that the non-Holiday Inn clause was illegal. *Cf.* Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

At a pre-trial conference held May 2, 1973, the plaintiff voluntarily withdrew in its entirety its Sherman Act Section 2 claim of monopolization, leaving for determination only the Section 1 claim. In addition, the case was bifurcated; the damage issue was to be tried, if necessary, after decision on the question of liability and the propriety of injunctive and declaratory relief. Trial without jury commenced on May 9. At the close of plaintiff's case, the court denied HI's motion to dismiss the action, but in view of the evidence and plaintiff's consent, granted the intervenor-defendant IAHI's motion to dismiss as against it.[3]

On AMI's motion for summary judgment and at trial, the parties injected other issues into the case. AMI challenged HI's policy of soliciting (by what shall be termed "radius letters") objections to proposed franchise sites from existing franchisees who own Holiday Inns near the proposed sites. AMI also challenged HI's ownership of company inns and HI's policy of discouraging or refusing applications for franchises in towns having company-owned Holiday Inns (hereinafter "parent company

---

1. "F . . ." refers to the numbered finding of fact contained in this opinion.

2. Upon defendant's motion, this court on February 22, 1973 permitted discovery to continue until March 13, subject only to the court's being able to calender the matter for trial prior to the latter date.

3. The IAHI was permitted to remain as amicus curiae, with the right to present documentary evidence and witness testimony through the prime defendant, HI.

towns"). Finally, AMI alleged that the radius letter, parent company town and non-Holiday Inn policies *cumulatively* result in a horizontal allocation of territories, in that they insulate any given existing Holiday Inn from unwanted competition from any other Holiday Inn or from any non-Holiday Inn owned by a Holiday Inns franchisee.

HI and the IAHI, for their part, have sought to characterize the non-Holiday Inn clause as a legal exclusive dealing arrangement, and have also sought to present business justifications for the clause.

## FINDINGS OF FACT

### I. *The Parties*

1. Defendant Holiday Inns, Inc. ("HI") is a publicly-held Tennessee corporation engaged primarily in the business of owning, operating and franchising inns, hotels and motels in interstate commerce (JX–1, ¶ 5),** and together with its subsidiaries and licensees, constitutes the largest hotel-motel business in the United States (JX–1, ¶ 10). As of December 31, 1972, there were 1,470 Holiday Inns, 1,380 located in the United States (JX–1, ¶ 8). The defendant and its subsidiaries directly owned or operated 297 of these inns, 281 in 152 United States cities (JX–1, ¶ 9). The other 1099 Holiday Inns in the United States are independently owned or operated pursuant to license agreements with defendant (JX–1, ¶ 9). Defendant's revenue from the franchising and operation of inns, hotels and motels totaled approximately $419,000,000 in its fiscal year 1972 (JX–1, ¶ 7).

2. Plaintiff American Motors Inns, Inc. ("AMI") is a publicly-held Virginia corporation engaged primarily in the business of owning and operating inns, hotels and motels in interstate commerce under license agreements from defendant Holiday Inns (JX–1, ¶ 1). AMI is defendant's largest franchise, owning or operating 48 Holiday Inns. It has fran-

chises from defendant to build another eight, and has commitments from defendant for five additional franchises (JX–1, ¶ 3; Tr. 137). Plaintiff's inns are located in Tennessee, North Carolina, Virginia, Maryland, Pennsylvania, Connecticut, Maine, Massachusetts and Puerto Rico (Tr. 31). AMI's revenue from operation of hotels and motels totaled approximately $44-million during its fiscal year 1972. (JX–1, ¶ 7).

3. International Association of Holiday Inns ("IAHI") is a non-profit unincorporated association of licensed owners or operators of Holiday Inns, including company owned or operated Inns, in which each Inn has one vote. (JX–1, ¶ 6) (Tr. 808–10, 864–65). The Holiday Inns License Agreement provides, and has always provided, for the existence of the IAHI. (DX–1, 2, 3, PX–8, PX–21, ¶ Twelfth, Tr. 806).

### II. *The Holiday Inn System*

4. The Holiday Inns System is an organization of hotels and motels, based upon registered service marks, and established to furnish the traveling public with a standarized system of food, lodging accommodations and services. (Tr. 774, 784). The Holiday Inn System has total revenues of nearly $1 billion a year. (DX–452).

5. Since 1968 HI has not granted any licenses for exclusive territories; Holiday Inns licenses are now issued only for specific locations, though approximately 50 territorial licenses remain. (JX–1, ¶ 4).

6. Except for licenses issued in 1957 and 1969, respectively, relating to Roanoke, Virginia and Baltimore, Maryland, AMI's franchises are for specific locations. With regard to Roanoke, AMI has the exclusive right to obtain Holiday Inn franchises in a territory including Roanoke and a 50 mile radius of the city. As to Baltimore, the exclusive right covers the City of Baltimore and a two mile radius beyond the city limits. (JX–1, ¶ 4).

---

** Unless otherwise noted, "Tr." refers to the trial transcript. "JX–1" refers to the stipulation of facts between the parties prior to trial.

A. *Holiday Reservation System*

7. Holiday Inns, Inc. has always offered free advance reservations to the traveling public. (Tr. 1535).

8. Prior to 1965, one Holiday Inn made reservations at other Inns for guests by means of the telephone, teletype, Western Union and letters. (Tr. 1535). In 1962 HI determined to develop a more effective method of referrals because demand for reservations was exceeding the capabilities of the teletype method then in use, and because the teletype method was uneconomical in terms of personnel time and cost of operation. (Tr. 964–965).

9. The resulting Holidex System of computerized reservations and referrals among Holiday Inns was put into effect in 1965. That system links every Holiday Inn on the North American continent to central computers located in Memphis, Tennessee. It enables reservations to be made and confirmed quickly from one Holiday Inn to another and from a number of reservation (sales) offices to Holiday Inns. In addition, when the computer cannot confirm a reservation, it reflects any space available at the Holiday Inns nearest the desired location. (JX–1, ¶ 39–42). Each Holiday Inn must have a Holidex terminal in operation 24-hours a day, and may have no other reservation terminal or system. (PX–110, I–28).

10. The costs of operating the Holidex System are borne by the Holiday Inn franchisees through installation charges for their Holidex reservation terminals, and through charges of $2.50–$3.00 per room per month. In return for these charges, Holiday Inn franchises have the right to an unlimited number of messages through the Holidex computer and may receive reservations referred through the computer from other Holiday Inns, from Holidex reservation (sales) centers in six North American cities and from Holidex terminals at a number of major corporations. (JX–1, ¶ 44).

11. The national reservation-referral concept has been very important to the growth and success of the Holiday Inn System and has resulted in increased referrals within the System. (Tr. 948, 1057, 1160–1161, 1433, 1473–1474, 1477, 1538, 1575, 1597, 1823, 1878–1879).

12. For the years 1970, 1971 and 1972, about 30–38 percent of the total occupancy of all Holiday Inns originated from reservations made through Holidex. (Tr. 949–950, 1060–1064; DX–21, 24). However, inn-to-inn reservations made through Holidex—as opposed to reservation center-to-inn or corporation-to-inn reservations—account for only 21.4 percent of the total occupancy. (DX–355, 359, 365, 365(a)(b), 366, 367, 368, 370).

B. *Franchising Policies*

13. The Executive Committee of HI has delegated certain responsibilities to the Franchise Application Committee, which considers franchise applications and may make final decisions on all applications which the Franchise Committee decides to deny. (Tr. 795–97, 913–1369).

14. When a prospective franchisee (either with or without previous Holiday Inn franchises) applies for a franchise, a site inspection is performed by HI in order to obtain relevant market data, including information as to existing inns of any type in the area. (Tr. 974, 1339).

(1) *Radius Letters to Existing Franchisees*

15. It is the standard practice of the Franchise Sales Department of HI to send written notices (hereinafter referred to as "radius letters") of a franchise application to at least the three Holiday Inns nearest the proposed site, irrespective of whether or not such Holiday Inns are open (JX–1, ¶ 14).

16. Franchisees who receive notice of an application have fifteen days from the date of such notice to send the Franchise Sales Department of HI written

comments regarding the desirability of establishing a Holiday Inn at the proposed location. (JX–1, ¶ 14). However, no franchisee is under any obligation to respond to the radius letters. (Tr. 118).

17. All responses to radius letters are reported to the Franchise Committee of HI by the Franchise Sales Department when an application for a new franchise is submitted to that committee. (Tr. 991).

18. The overriding importance HI attaches to objections by franchisees is apparent from HI's procedures when objections are received. When the Franchise Committee concludes that a franchise application should be granted but has received an objection to the application from an existing franchisee, the decision to grant the franchise application may be made only by the Executive Committee. The fact that an objected-to application is considered by the Executive Committee indicates that the Franchise Committee has recommended approval of the application. (Tr. 914, 1369).

19. In 1972, the Executive Committee considered objections to 75 applications for Holiday Inns franchises, which objections were received from owners of nearby Holiday Inns. Of these objected-to applications 43 (57 percent) were not granted. (DX–40). HI's franchising procedures indicate that these 43 applications would have been granted but for objections from existing franchisees.

20. AMI has written letters to HI objecting to franchise applications submitted by other companies. In at least two instances, Charlotte, North Carolina and Gastonia, North Carolina, the basis of the objections made by AMI was that a new inn might take business away from an existing AMI inn. (Dep. J. Krish, Tr. 55 (lines 2–25)).

### (2) *"Parent Company Towns"*

21. Defendant, as of December 31, 1972, directly or through its subsidiaries, owned or operated 281 Holiday Inns in the United States in approximately 152 different cities or towns (JX–1, ¶ 9). In at least half of these areas defendant owns or operates the only Holiday Inn. (Tr. 825–26). These include such major cities as Austin, Texas (PX–88, Nos. 80–81; PX–87, p. 182); Tucson, Arizona (PX–88, Nos. 40–41; PX–87, p. 34); Amarillo, Texas (PX–88, Nos. 62–65; PX–87, p. 181); Albuquerque, New Mexico (PX–88, Nos. 60–61; PX–87, p. 128); Lexington, Kentucky (PX–88, Nos. 261–63; PX–87, p. 94); Corpus Christi, Texas (PX–88, Nos. 258–60); PX–87, p. 183); Fort Worth, Texas (PX–88, Nos. 52–55; PX–87, p. 186); Charleston, South Carolina (PX–88, Nos. 88–91; PX–87, p. 169); Honolulu, Hawaii (PX–88, Nos. 14 & 18; PX–87, p. 73); Topeka, Kansas (PX–88, Nos. 245–47; PX–87, p. 91); and Salt Lake City, Utah (PX–88, Nos. 236–37; PX–87, p. 193).

22. I find, on the basis of deposition testimony by Kemmons Wilson, Chairman of the Board and founder of HI, introduced at trial, that there is a general practice of not granting franchises in a town having a company-owned inn:

"Q. Are you familiar with any policy whereby Holiday Inns will turn down applications because the company is operating its own Inn in those towns?

A. Yes. I mean, we generally—if we are operating in a town—will not sell franchises, but we have done it.

Q. There have been exceptions, but the general practice . . .

A. . . . The general practice is we don't do it . . . .

Q. In a city where the company has company-owned inns first, generally speaking, it will not grant franchises?

A. That is true." (Wilson Dep., p. 63, lines 1–21).

In weighing the evidence on this point, I attach particular significance to the fact that Wilson did not testify at trial to refute this testimony.

23. Defendant has at the very least continually discouraged franchisees from applying for franchises in areas where defendant owned or operated the only Holiday Inn. (Tr. 57–70). For example, T. T. Beasly, Associate Director of Franchises wrote in response to an inquiry by AMI as to the availability of a franchise for Flint, Michigan:

"Thank you for your letter of January 27, 1970. The Parent Company is [sic] informed us that Flint, Michigan is what they consider a Parent Company town and that they presently have a second inn planned there.

I am sorry that we will not be able to work with you there." (PX–14; Tr. 66–68)

The only Holiday Inn in Flint is company-owned. (PX–88, No. 196; PX–87, p. 107).

24. Similarly, when AMI inquired as to the availability of a franchise in Knoxville, Tenn., an area contiguous to AMI's other operations, William E. Dover, Associate Franchise Director for the Central United States wrote:

"Adolph [Krisch, Chairman of the Board of AMI], as you know, Knoxville, Tennessee is a parent company town and having recently tried to work a franchised deal north of Knoxville, I can tell you it is a losing battle." (PX–15; Tr. 61–63).

The company continues to own or operate the only Holiday Inns within the City of Knoxville. (PX–88, Nos. 113–16; PX–87, pp. 176–77).

25. When AMI inquired in 1969 as to the availability of a franchise for a site in Fort Worth, Texas, (Tr. 68–70), the inquiry was rebuffed by Donnelson Lake, *Director of Franchise Sales*:

"Unfortunately, we would be unable to work with you in this location. As you know, all of the Inns in Fort Worth are operated by the Parent Company, and they do not feel that their experience would warrant another development in the area." (PX–12).

Defendant has since commenced construction of a new company-owned inn in Fort Worth, and continues to own or operate all the Holiday Inns in Fort Worth. (PX–88, Nos. 52–55; PX–87, p. 186; Tr. 822–23).

26. AMI also discovered attractive sites for motor hotels in Columbus, Georgia (Tr. 57–61; 172–73), Saratoga Springs, New York (Tr. 63–65), New Orleans, Louisiana, Tulsa, Oklahoma and Chicago, Illinois. In all these cases AMI's inquiries were rejected on the grounds that the company itself was operating, and intended to continue to operate the only Holiday Inn in the area. (PX–13; PX–16; See PX–88, Nos. 1–2, 59, 127, 226–29, 119–20 & 182; PX–87, pp. 70 & 136).

27. I find that at the time AMI inquired as to each of these cities, there was a need for additional motels in these areas. (Tr. 183–85). AMI was interested in building a motor hotel other than a Holiday Inn in these areas if it could not secure a Holiday Inn franchise, but the non-Holiday Inn clause prevented it from doing so. (Tr. 57–72).

28. While HI has introduced evidence that some franchises have been granted near company-owned inns, (Tr. 1175–76; 1515–16; 1604–05), such testimony does not negate the existence of the practice. (Wilson Dep., pp. 62–63). The evidence therefore demonstrates that a significant number of cities are "parent company towns" in which franchisees may not compete with company-owned inns by building a Holiday Inn or a non-Holiday Inn.

29. The number of such towns is likely to increase as defendant has embarked on "a more aggressive Company inn expansion program." (PX–84, p. 3; Tr. 833–34). In some cases, defendant has even acquired a franchisee's interest in the only Holiday Inn in a given town. (Tr. 832–33).

30. In no company-town may a Holiday Inn franchise application be granted

without the approval of Holiday Inns' Executive Committee; the Franchise Committee is without the authority to grant a franchise application. (Tr. 889). Thus, both a franchise application for a parent company town and a franchise application objected to by an existing franchisee may be approved only by the Executive Committee, and not by the Franchise Committee.

## C. *Non-Holiday Inn Clause*

### (1) *Background of the Clause*

31. The non-Hoiday Inn clause has appeared in HI's license agreements since 1953. The clause has provided:

" . . . that licensee will not, directly or indirectly, own any interest in, operate, or be in any manner connected with or associated with, any inn, hotel or motel, during the period of this license, except Holiday Inns." (JX-1, ¶ 11).

32. From 1953 to 1958, HI granted exclusive licenses for a designated geographic area. (Wilson Dep., p. 13, line 17 to p. 14, line 1). Those licenses prohibited the licensee from owning or operating a non-Holiday Inn within the specified licensed territory. (Tr. 788). In or about 1957 or 1958, however, the phrase "within the licensed territory" was stricken so that the licensees have since been prohibited from owning or operating a non-Holiday Inn anywhere. (Tr. 788, 2110–14).

33. Testimony concerning defendant's original purpose in instituting the non-Holiday Inn clause relates to deletion of the phrase "within the licensed territory" from that clause and from a "best efforts" clause. (Tr. 788, 919).

34. One Albert Pick had operated a number of hotels under his own name prior to becoming a Holiday Inns franchisee. (Tr. 848–49). After having received some five or six Holiday Inns franchises, he sought a Holiday Inns franchise in Montgomery, Alabama. (Wilson Dep., p. 39). Pick's application was rejected because there was already a franchisee in Montgomery. (Wilson

Dep., p. 39). Thereafter, Pick built a motel under the Pick name in Montgomery, and elsewhere. (Wilson Dept., pp. 39–44). When a HI inspector found a brochure in a Pick Holiday Inn advertising the Pick motel in Montgomery instead of the Holiday Inn in Montgomery (Tr. 844), HI became concerned that Pick was referring business to his own Motel in Montgomery rather than to the local Holiday Inn. (Tr. 789–90, 834–61, 1226–27).

35. Since the Pick license agreements only prohibited the ownership of non-Holiday Inns "within the licensed territory", and since the "best efforts" clause also was limited to the licensed territory (Tr. 919), HI could not invoke either clause. It simply arrived at an agreement with Pick which resulted in Pick's giving up its Holiday Inn franchises. (Tr. 859–60).

36. After the Pick incident both the non-Holiday Inn clause and the "best efforts" clause were broadened so as to remove the "licensed territory" limitation. (Tr. 788–90; 862–63; 919). According to William B. Walton, President of HI, the sole reason for changing the non-Holiday Inn clause was to prevent someone like Pick from referring customers to his own inn at another location rather than to a Holiday Inn. (Tr. 789–90). Yet, I find that the obligation to refer business to other Holiday Inns was and is contained in the "best efforts clause", not in the non-Holiday Inn clause. (Tr. 858–59; 874).

37. On the other hand, with regard to the purpose behind the 1958 change, Wilson focused on the fact that Pick had operated his own independent motels in competition with existing Holiday Inns. In answering questions, Wilson testified:

"A. Well, they were operating some Holiday Inns and they built this Albert Pick motel in Montgomery, and they also applied to us, I believe, for a franchise in St. Louis, and we told them the same thing.

In both cases they went right down the street.

The same thing is true today. If anybody was allowed to build any kind of hotel rather than a Holiday Inn, your own friend could go across the street and build a Ramada Inn or something else, and its just something that should never happen.

Q. Do you recall what the actual experience was in Montgomery? What happened when they operated the Albert Pick Motel? Did it compete with Holiday Inn right down the street?

A. Of course.

Q. And the same thing in St. Louis?

A. Of course." (Wilson Dep., p. 44 lines 6–23).

*(2) Enforcement of the clause*

38. It is defendant's policy to enforce the non-Holiday Inn clause, as set forth in Holiday Inns' Executive Committee Meeting minutes dated November 7, 1966:

"RESOLVED, that if a franchise holder violates his franchise agreement with Holiday Inns of America, Inc., by retaining competitive interests in other motels or hotels he shall be given six months to dispose of such competitive interests, at the expiration of which time the franchise will automatically be terminated if this has not been accomplished." (JX–1, ¶ 12).

39. The franchisees, all of whom are members of IAHI, have been dissatisfied with what they consider to be HI's failure to enforce the non-Holiday Inn clause stringently. (Tr. 1153–54; 1692; 2080–81). As a result, they have sought to have the Executive Committee of IAHA "put more pressure" on HI to enforce the clause. (Tr. 2082–83).

*(3) Alternatives to the non-Holiday Inn clause*

40. There are provisions, wholly apart from the non-Holiday Inn clause, in HI's license agreements which prohibit a Holiday Inn from referring business to a non-Holiday Inn. For example, "Licensee does further covenant and agree . . . to use every reasonable means to encourage use of 'Holiday Inns' on a national basis by the traveling public." (PX–8, ¶ 2(i). Walton testified that this "best efforts" clause has always been in HI's license agreement and requires a licensee to refer business to other Holiday Inn motels. (Tr. 858–59).

"Q. . . . Are you aware of any provision in the contract which prohibits a licensee from referring business to a motel or hotel other than a Holiday Inn motel or hotel?

A. There is a provision that provides that you would promote the Holiday Inn system on a nationwide basis. In my opinion, that would mean that you would send your referral business to Holiday Inns.

Q. Now that is a separate provision from what you call the no-conflict-of-interest provision, is that correct?

A. That is correct." (Tr. 858–59; see 874).

HI's Senior Vice President, Robert T. Ashman (Tr. 1058) and franchisees Earl Jones (Tr. 1632–35) and Julius Eldridge (Tr. 2087) similarly testified that this "best efforts" clause requires franchisees to refer business to other Holiday Inns.

41. Assuming that a licensee were willing to breach the "best efforts" clause in his license agreements, the sole way the franchisee could refer guests to a non-Holiday Inn would be through use of the telephone and the teletype (Tr. 1690–92), since Holidex only operates with respect to Holiday Inn rooms. (Tr. 1784). The record establishes that such methods are so slow, costly and inefficient that they are impractical. (JX–1, ¶ 40; Tr. 1535–38). As long as an inn did not have other computerized reserva-

tion equipment on its premises (which could be easily determined by HI during its regular inspections (Tr. 2021–23) ) an inn could not operate an effective referral system. (Tr. 1628–29).

42. In addition to the "best efforts" clause, all license agreements issued by HI from 1958 through 1971 have the following addendum:

"The owner or lessee of any Holiday Inn built or operated under this License Agreement shall not be an associate or associate member or affiliated in any manner with any organization, company or group, the primary purpose of which, either express or implied, is to set a standard for motels or hotels and/or to request or require its members to refer business to other members of that organization, company or group." (PX–8, ¶ 14; Tr. 2110–11).

This clause, is far less restrictive than the non-Holiday Inn clause, because it says the "same thing" as the "best efforts" clause (Tr. 864) without prohibiting franchisees from owning or operating non-Holiday Inns.

43. Defendant hypothesizes that if a franchisee were able to own a non-Holiday Inn near his Holiday Inn he would be able to accept reservations through Holidex, and then steer the unsuspecting customer to his non-Holiday Inn. (Tr. 1490–91; 1589–91; 1881–82). However, this practice would constitute a violation of the existing "best efforts" clause (Tr. 1639–41), and the misled customer would almost certainly complain to Holiday Inns. (Tr. 1636). Even this situation could occur only if the franchisee built a non-Holiday Inn in close geographical proximity to his existing Holiday Inn. (Tr. 1637–38). Such an abuse could be prevented by adoption of a narrower proscription than the non-Holiday Inn clause, such as that found in the Howard Johnson License Agreement. (PX–107, ¶ 7).

44. HI suggests that the "best efforts" clause might be difficult to enforce. (Tr. 1150). However, a violation of the non-Holiday Inn clause itself is "awfully hard to prove" (Lake Dep., p. 79, line 4 to p. 80, line 8; Tr. 1693–98). Moreover, the easiest violation to uncover would be an effort by a Holiday Inns franchisee to steer a guest toward a non-Holiday Inn, since such a customer would most likely complain directly to HI. (Tr. 1636). In sum, I find that the record does not establish that the "best efforts" clause is any more difficult to enforce than the non-Holiday Inn clause.

45. HI has also suggested that Holidex could be used to determine attractive locations for non-Holiday Inns. (Tr. 1495, 1592). The record demonstrates, however, that no one would build an inn in a given locale based upon information received solely from a Holidex check (Tr. 1630), since Holidex would only reveal whether an inn were *reporting* full, not whether or not an inn were *in fact* full. (Tr. 1630–31). Nor would Holidex show the percentage occupancy (Tr. 1631). Anyone could acquire this same information simply by telephoning defendant's central sales reservation offices (Tr. 1631–32) or by calling the inn directly. (Tr. 1667).

46. Sheraton Inns, Inc. (Tr. 416–18), Hilton Inns, Inc. (Tr. 319–20) and Howard Johnson Motor Lodges (Tr. 368–69) all have computerized reservation systems, but none has a provision as broadly restrictive of competition as defendant's non-Holiday Inn clause. (PX–99; PX–100; PX–107).

47. Hilton's license provides that a licensee will not operate a non-Hilton inn "without the prior written consent of [Hilton], which consent [Hilton] agrees not to unreasonably withhold." (PX–100, ¶ 8). In every case Hilton has granted its consent, so that there are a number of Hilton licensees operating both Hilton and non-Hilton Inns. (Tr. 320; 346–56).

48. Howard Johnson only prohibits a licensee from owning a non-Howard Johnson inn "within a radius of 25 miles" of the licensed inn. Even then, such an inn could be built with Howard Johnson's consent, "which shall not be unreasonably withheld." (PX–107, ¶ 7).

49. Sheraton has no restriction on its franchisees' operation of non-Sheraton inns, although the licensee has an affirmative contractual duty to refer guests to other Sheraton Inns. (PX–99, ¶ 7(k)).

50. Although HI claims that the purpose of the non-Holiday Inn clause was and is to preserve the integrity and utility of the national reservation-referral system, I find that in operation that clause has had a much broader effect. That effect is the intended one of reducing and preventing competition among Holiday Inns franchisees and between franchised inns and company-owned inns. I find that if HI sought solely to protect its reservation-referral system, such protection was and is available through other provisions of its contract (e. g. best efforts clause), and was and is available through less restrictive provisions of the type utilized by other national hostelers.

III. *Relevant Competitive Market*

51. Defendant HI together with its subsidiaries and licensees constitutes the largest hotel-motel business in the United States (JX–1, ¶ 10), more than three times the size of its nearest competitor. (PX–83, p. 19; PX–84, p. 24; PX–85).

52. Licensed Holiday Inns compete among each other and with Holiday Inns owned or operated by defendant for the custom of the traveling public. (PX–87; Tr. 73, 1176–77, 1505, 1515–17, 1604–05, 1730).

53. In 1967 there were 44,903 hotels, motels and motor hotels within the United States as enumerated by the 1967 Census of Business. (DX–29, Table 24). As of June 30, 1967 there were 719 Holiday Inns licensed by, and 139 Holiday Inns owned or operated by, HI in the United States and elsewhere. (DX–28). Therefore, as of 1967 approximately 1.6% of the total number of hotels, motels and motor hotels within the United States were *franchised* Holiday Inns, and approximately 1.9% were Holiday Inns.

54. At the end of 1971 there were 7,430 motor-hotels in the United States with 803,734 rooms (DX–33, Table I). A motor-hotel is defined as "a property with transient lodging facilities, built or completely modernized since 1945, open year-round (or in some instances more than half the year) and containing at least 50 guest units, plus adequate on-premises free parking." (DX–33, p. 2).

55. Over 50-room-motels might be considered a relevant market for the purposes of this case. For example, Krisch testified that a motel under 50 rooms could not offer the facilities that Holiday Inns' customers expect such as proper parking, cocktail lounge, swimming pools, etc. (Tr. 72). Evidence has been introduced by HI that its franchisees rely upon these amenities being available at other Holiday Inns as part of the incentive to refer guests to those inns. (e. g., Tr. 1496; 1593; 1885). In addition, a review of the Directory of Holiday Inns establishes that of the 1,470 Holiday Inns, only four have less than 50 rooms. (PX–87).

56. As of December 31, 1971 there were 1,290 Holiday Inns in the continental United States. (PX–84, p. 13). HI together with its franchisees constituted approximately 17% of the over 50-room motor-hotel properties in the United States (PX–84; DX–33) and, in terms of number of rooms, constituted 24.7%. (PX–97; DX–33, p. 4, Table). As of December 31, 1971 there were 1,026 franchised Inns in the United States (PX–84; pp. 3, 5, 11–12) which constituted approximately 14% of the over 50-room motor hotel properties and approximately 18.3% of the number of rooms. (DX–33; PX–97).

57. The following table compares data from *Hospitality* (Dec. 1972), a lodging industry magazine, on the 29 largest mo-

tel-hotel chains and referral groups in the United States, as of 1972:

| Chain on Referral Group ("RG") | No. of Properties 1972 |
|---|---|
| Admiral Benbow Inns | 16 |
| Best Eastern Motels (RG) | 250 |
| Best Western Motels (RG) | 1,050 |
| Downtowner Motor Inns | 98 |
| Dunfey Family Hotels | 18 |
| Econo-Travel Motor Hotel Corp. | 357 |
| Friendship Inns | 915 |
| Heritage Management | 12 |
| Hilton Hotels Corp. | 95 |
| Holiday Inns | 1,407 |
| Howard Johnson's | 444 |
| Hyatt House Hotels | 63 |
| Imperial 400 | 103 |
| Loews Hotels | 12 |
| Marriott Hotels | 24 |
| Motel 6 | 91 |
| Pick Hotels | 28 |
| Quality Inns | 396 |
| Ramada Inns | 472 |
| Red Carpet Inns and Master Hosts | 236 |
| Regal 8 | 15 |
| Rodeway Inns | 104 |
| Royal Inns | 61 |
| Sheraton Hotels and Motor Inns | 228 |
| Sonesta Hotels | 10 |
| Superior Motels | 430 |
| Travelodge | 456 |
| Treadway Inns Corp. | 40 |
| Western International Hotels | 54 |
| Total | 7,485 |

(DX–38; DX–A–54)

58. Holiday Inns System accounts for 18.8 percent of the 1972 properties included in the 29 largest hotel-motel systems utilizing national referrals, and the independent Holiday Inns franchisees account for 14.7 percent.

IV. *Background of the instant litigation*

59. In late February 1971 the City of Elizabeth, New Jersey published an invitation for bids, on a purchase or lease basis, with respect to a piece of property in Elizabeth, New Jersey known as the Alvin R. Eaton Memorial Home Property ("Elizabeth Property") 1000 ft. from the proposed new passenger terminal for the Newark Airport. (JX–1, ¶ 21). On or about March 11, 1971 J. I. Kislak Realty Corporation, acting on behalf of AMI, submitted a bid of $912,250 to the City of Elizabeth to purchase the Elizabeth Property. (JX–1, ¶ 23). The City also received responses from the principals in the franchised Newark Airport Holiday Inn and from W.E.B. Associates, operators of the Howard Johnson Motor Lodge at the Newark Airport. (JX–1, ¶ 23).

60. On April 13, 1971 the City Council voted to sell the Elizabeth Property to AMI, the high bidder, for $912,250. (JX–1, ¶ 26). The deed conveying title to AMI (PX–3) was executed Dec. 30, 1971 and provided, *inter alia,* that "The use of the land is hereby limited to the building of a multi-story hotel-motel-office complex . . . ." (PX–3, p. 3). The deed further provided that "The grantee shall have a period of one (1) year from the date hereof to commence construction as contemplated and shall complete at least one million dollars ($1,000,000.00) worth of improvements within eighteen (18) months thereafter." (PX–3, p. 4).

61. On or about April 20, 1971, AMI submitted an application to defendant for a license to operate a Holiday Inn on the Elizabeth Property. (JX–1, ¶ 27). Pursuant to its standard procedure, defendant on April 30, 1971 issued its "radius letters" to the three closest Holiday Inn operators (Carteret, New Jersey; Newark-Downtown and Newark Airport) notifying them of AMI's application for a franchise at the Elizabeth Property and soliciting their comments on the application. (JX–1, ¶ 28).

62. HI's Carteret licensee, by letter dated May 13, 1971 responded to the radius letter by objecting to the grant of a franchise for Elizabeth, on the grounds that "An inn directly across from the Airport, where this location is projected to be built, would definitely take business away form my inn at Carteret." (JX–1, ¶ 29; PX–61).

63. Arthur Fleck, a principal of Newark Motor Inn Corp., HI's licensee at Newark Airport, vigorously objected to the granting of AMI's application because, "it was so close to our [inn]." (Tr. 444). Fleck expressed his objections to AMI's application in a series of letters, conversations and meetings.

(JX–1, ¶ 30; PX–47; PX–49; PX–50; PX–51; PX–52; PX–53; PX–54; PX–55).

64. Construction of the Newark Airport Holiday Inn had begun in late 1969, and the inn was officially opened as part of the Holiday Inns System on March 8, 1971. (JX–1, ¶ 22; Tr. 423–25).

65. Fleck had informed HI as early as 1969, that he was prepared to add 220–250 additional rooms to the Newark Airport Holiday Inn in the event that the Newark Airport generated sufficient business. (Tr. 426, 431, 439). However, in January 1970, Fleck notified HI, Inc. of his interest in acquiring the Eaton property in order to erect a Holiday Inn in lieu of the proposed addition to the existing inn. (Tr. 433–34).

66. Elizabeth, New Jersey was placed on a sixty-day "hold" for Fleck on July 21, 1970 by Robert D. Acker, Director of Franchise Sales for the Eastern United States, on behalf of HI. (JX–1, ¶ 25; Tr. 1324–29). This "hold" had expired several months prior to HI's Franchise Committee's consideration of the AMI application for a franchise in Elizabeth. (Tr. 1410).

67. The Franchise Committee, on October 8, 1971, considered the AMI application for a franchise on the Eaton property. (Tr. 1012, 1344, 1355). The objections of Fleck and of the Carteret licensee had been presented to the Committee beforehand and were dispositive to the Committee. (JX–1, ¶ 32). The minutes of that meeting read:

"Mr. Acker presented [AMI's] application with the recommendation of denial due to the objections submitted by Messrs. Arthur and Ed Fleck of Newark, N.J. Mr. Acker felt that this inn would encroach upon their Newark Airport location." (PX–63, pp. 3–4).

68. The Franchise Committee unanimously denied AMI's application. (Tr. 1363–1364).

69. Donelson Lake, HI's Director of Franchise Sales, testified upon his deposition that there were no reasons for the denial of AMI's application except those set forth in the minutes of the Franchise Committee Meeting and the comments of the Carteret franchisee. (Lake Dep., p. 66, lines 10–14). In light of the surrounding documents, I accept that testimony.

70. Wilson, Chairman of the Board of Holiday Inns, testified upon deposition that to his knowledge also, the main reason for rejecting AMI's application was the objection by Fleck and the Carteret franchisee:

"Q. To the best of your knowledge and recollection, is it fair to say that AMI's application to build a Holiday Inn on that property was turned down because of the objections of these franchisees?

A. Yes, that was the main reason. Those things were looked at by us, and we decided that this was what should be done. The man had a valid complaint." (Wilson Dep., p. 34, lines 7–14).

In determining the weight to be accorded this testimony, it is particularly significant to note that Mr. Wilson did not testify at trial in this case.

71. In its letter informing AMI of the denial of the Elizabeth application, HI (by Acker) wrote:

"It was also our feeling that another Holiday Inn at your location would definitely be in competition with the existing Holiday Inn, especially since both facilities would be competing for airport business." (PX–5).

72. After AMI had been denied the franchise, AMI personnel and Holiday Inns representatives met together in or about January 1972 to discuss the alternatives available to AMI. (Tr. 50–51; Tr. 1373–74; Lake Dep., p. 68, line 17 to p. 71, line 22). This meeting was attended by Krisch, Chairman of the Board of AMI; Wilson, Chairman of the Board of HI; Lake, HI's Director of Franchise Sales; and Acker, HI's Director of Franchise Sales for the Eastern United States. (Tr. 50,1373; Lake Dep., pp. 68–69). At this meeting, Wil-

son suggested that AMI get in touch with the Newark Airport licensee to try to "work something out with them." (Tr. 51; Lake Dep., p. 70, lines 2–24).

73. Wilson confirmed his suggestion in a letter dated February 1, 1972:

"When you left, you were going to contact the people who had the Holiday Inn in Newark, New Jersey. Will you please let me know about this? If you were able to make a deal with them, there would be no violation as I see it." (PX–9; Tr. 51–52).

74. Acker did in fact arrange a meeting between AMI and Fleck. (Tr. 54–55; 483–85; 1374). Although no agreement was reached (Tr. 55; Tr. 483–85), it is clear that HI was prepared to accept any solution which satisfied Fleck, and thereafter to grant a franchise for a new Holiday Inn. (Tr. 1398–99).

75. Defendant's testimony that it denied AMI's application because no data showed the Newark Airport market sufficient to support two Holiday Inns is not credible. (PX–5; PX–63; Lake Dep., p. 66, lines 10–14; Wilson Dep., p. 34, lines 7–14). Indeed, Acker had written Fleck in connection with the now-expired "hold" granted for the Elizabeth site:

"We look forward to being of any assistance to you that we can and are ready to issue our standard franchise commitment letter upon receipt of your application." (PX–43).

Fleck's plans for expansion, together with Wilson's suggestion that AMI "work out a deal" with Fleck clearly shows that the Newark Airport area could support a second Holiday Inn.

76. I find that AMI's application for a franchise located on the Eaton Property, Elizabeth was rejected because of Fleck's objections, which were treated as a veto by HI.

77. After AMI's application for Elizabeth was denied, Joel Krisch, President of AMI, discussed with Irving Zeldman of Sheraton Inns, Inc. the possibility of an inn on the Eaton property becoming a part of the Sheraton chain. (J. Krisch Dep., p. 50 (lines 19–22), 51 (lines 3–25) and 52 (lines 2–24)).

78. Fleck testified that one of his purposes (communicated to HI) in seeking to purchase or lease the Elizabeth Property was to preclude another hotel-motel chain from building a motel at that location in competition with him. (Tr. 438–39). When he heard that AMI was considering operating a non-Holiday Inn on the Elizabeth Property (Tr. 455), Fleck discussed this matter with Acker. (Tr. 458–59; see PX–57).

79. When AMI formally requested defendant to waive the non-Holiday Inn clause, HI's Executive Committee denied the request. (PX–11; JX–1, ¶ 37). I find that as a result, AMI has been unable to proceed with the development of a motel on its Elizabeth Property.

## CONCLUSIONS OF LAW

■■ Section 1 of the Sherman Act literally proscribes "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." However, the "rule of reason" announced in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), limits the prohibitions of Section 1 to unreasonable restraints of trade. Inquiry pursuant to the rule of reason has traditionally proceeded according to guidelines formulated by Justice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps promotes competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular

remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*See also* United States v. Topco Associates, 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Once a restraint is determined to be unreasonable, there need be no further inquiry as to the substantiality of the commerce involved, since "by § 1 unreasonable restraints are banned irrespective of the amount of commerce involved." Times-Picayune v. United States, 345 U.S. 594, 611, 73 S.Ct. 872, 881, 97 L.Ed. 1277 (1953); United States v. Paramount Pictures, 334 U.S. 131, 173, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S. Ct. 1560, 91 L.Ed. 2010 (1947). *See also* United States v. First National Bank and Trust Co. of Lexington, 376 U.S. 665, 671–672, 84 S.Ct. 1033, 12 L. Ed.2d 1 (1964), *distinguishing* United States v. Columbia Steel Co., 334 U.S. 495, 527–528, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). It is not disputed that the trade or commerce herein involved is, in the words of Section 1, "among the several States."

### I. *Holiday Inns Franchising Policies*

#### A. Radius Letters Sent to Existing Franchisees

Whenever HI receives an application for a new franchise, it follows a policy of sending "radius letters" to its three existing franchisees closest to the proposed franchise site in order to solicit their comments (F 15–16). After evaluating any comments received, the HI Franchise Committee may grant or deny a franchise application (F 14). However, when an *objection* to a proposed franchise is received from an existing franchisee, the Franchise Committee may only *deny* an application. The authority to grant an application to which objection has been made, resides only with the Executive Committee of the Board of Directors of HI (F 18).

In the instant situation, HI solicited the comments of its Newark-Downtown, Newark Airport ("Fleck") and Carteret franchisees to the proposed AMI site in Elizabeth (F 61). The latter two franchisees registered objections, with Fleck objecting vigorously on the grounds that the market could not sustain another inn (F 62–63). Although there is substantial evidence, and I have so found, that the market could indeed sustain another inn (F 65, 72), HI denied the AMI application because of the objections (F 76), suggesting that AMI "work out a deal" with the Newark Airport franchisee (F 73–75).

*Restraint of Trade.* That a franchise system may operate in violation of Section 1 with regard to intra-brand competition[4] was made clear by United States v. Arnold, Schwinn & Co., 388 U. S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Although the defendant through IAHI argues that the "rule" with regard to franchising agreements was at one time "virtually one of *per se* legality", Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D. C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), rehearing denied, 357 U.S. 923, 78 S.Ct. 1358, 2 L.Ed.2d 1363 (1958), the *Schwinn* Court modified that "rule." Indeed, plaintiff argues that the radius letter policy is illegal *per se*[5] under

---

4. Intra-brand competition is competition among Holiday Inns franchisees in the market of "Holiday Inn motel beds." Inter-brand competition is competition among Holiday Inns, Sheraton Inns, Ramada Inns, etc.

5. The rule of reason has been refined by the doctrine of per se illegality, which applies to "certain agreements or practices which be-

cause of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific R. R. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Supreme Court has applied the

*Schwinn* alone. The *Schwinn* Court, however, was concerned with a vertical allocation of franchise territories for the sale of goods. It was held "unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." 388 U.S. at 379, 87 S.Ct. at 1065. The mere "vertical" act of Schwinn granting or refusing franchises was not held illegal.

Plaintiff here does not allege that HI has a policy that prevents one *established* Holiday Inns franchise from competing with another *established* Holiday Inns franchise, a situation that would be analogous to that in *Schwinn*.[6] Nor is plaintiff objecting to HI's right to exercise a "vertical" decision to refuse a franchise for Elizabeth. Instead, plaintiff argues that: (1) the "radius letter policy" operates as a horizontal conspiracy to deny applications for *new* franchises, thereby restricting *intra-brand* competition among Holiday Inns franchisees; (2) the non-Holiday Inn clause (to be discussed below) operates as an illegal contractual inter-brand restriction of competition between Holiday Inns franchisees owning Holiday Inns and Holiday Inns franchisees desiring non-Holiday Inns. These concepts are not within the doctrine and holding of *Schwinn*. *See also* Anderson v. American Automobile Association, 454 F.2d 1240 (9th Cir. 1972).

In its market effects and manner of operation, the HI radius letter policy is closely analogous to the horizontal allocation of territories condemned in United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).[7] In *Topco*, 25 small supermarket chains formed a wholly-owned cooperative association ("Topco Associates") to serve as purchasing agent for its members and to distribute Topco-brand products. Applicants for membership in Topco Associates required the approval of the Board of Directors and of 75 percent of the existing members. If the closest existing member, or any member within 100 miles of the applicant, voted against approval, however, then an 80 percent vote was required. This practice operated as "a veto of sorts over actual and potential competition." *Id.* at 602, 92 S.Ct. at 1131. Most licenses granted were exclusive for given territories. Moreover, the Court found that "[e]xclusive territorial areas [i. e. "holds"] are often allocated to members who do no actual business in those areas on the theory that they may wish to expand at some indefinite future time and that expansion would likely be in the direction of the allocated territory." The agreements were enforced by the threat of termination of a license. The Supreme Court held the Topco system illegal *per se* because "[w]hen combined with each member's veto power over new members, provisions for exclusivity

---

per se doctrine to price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), to group boycotts, Fashion Originators' Guild v. FTC, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941), to tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1948), and to "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition," United States v. Topco Associates, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

6. A Schwinn bicycle distributor in "Territory A" was capable of competing with a Schwinn distributor in "Territory B" 100 miles distant, but was precluded by the manufacturer from shipping his goods into "Territory B." Here, a Holiday Inns franchisee in "Territory A" would usually be incapable of competing in "Territory B" because of the nature of the lodging industry. Thus, if for no other reason, *Schwinn* is distinguishable because of the inherent differences between a sales industry and a service industry.

7. *See also* United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

work effectively to insulate members from competition in Topco-brand goods." *Id.* at 602, 92 S.Ct. at 1131.

■ I find the instant situation analogous to that in *Topco*.[8] Individual Holiday Inns franchisees have of course not combined to create and own HI, as the Topco franchisees created and owned Topco Associates. However, through the radius letter technique Holiday Inns franchisees have utilized the parent HI as Topco franchisees utilized the "parent" Topco Associates—to allocate territories horizontally so as to restrict intra-brand competition.

The operations of the two systems have much in common.[9] In *Topco* an objection to a new member resulted in an additional requirement—approval had to be obtained from 80 percent instead of 75 percent of existing members. Here, an objection to a prospective franchise results in an additional step in the approval process—approval by the Executive Committee instead of by the Franchise Committee.[10] It is true that the Executive Committee could approve the new franchise despite any objection, and in fact did so in the year 1972 43 percent of the time (F 19). However, it is also true that in 57 percent of the applications brought to the Executive Committee, the objection resulting from the mailing of radius letters acted as a "veto of sorts" in the same manner as the increased approval percentage in *Topco* was held by that Court to act as a "veto".

■ *Conspiracy*. Defendant argues that its radius letter policy does not violate Section 1 because HI's actions are unilateral. *See* United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L. Ed. 992 (1919). I cannot agree. HI does not make unilateral decisions to grant or deny franchise applications. Instead, it solicits and considers information and objections from existing franchisees (F 15–18), and rejects many applications on the basis of objections (F 19). *See* Ford Motor Co. v. Webster Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966). This process is "joint and collaborative." United States v. General Motors Corp., 384 U.S. 127, 144–145, 86 S. Ct. 1321, 16 L.Ed.2d 415 (1966). *See also* 9 Von Kalinowski § 65.03(1). "[W]hether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used." United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960). In the instant situation, each objecting franchisee knew of HI's standard policy of soliciting their comments by means of the radius letters. Each knew that even one objection would result in the inability of the Franchise Committee to grant a franchise application; only the Executive Committee could grant an application over objection. Without the active cooperation of existing franchisees' sending HI comments and objections, the radius letter policy would obviously have been meaningless. "Acceptance by competitors, without previous agree-

---

8. Defendant in the instant case makes the argument accepted by the district court in *Topco*, to wit "that by limiting the freedom of its individual members to compete with each other, Topco was doing a greater good by fostering competition between members and other large supermarket chains." 405 U.S. at 610, 92 S.Ct. at 1135. The Supreme Court rejected that argument in *Topco*:

> Without territorial restrictions, Topco members may indeed [cut] each other's throats . . . . But, we have never found this possibility sufficient to warrant condoning horiztonal restraints of trade.

*Id.* at 611, 92 S.Ct. at 1135. *See also Schwinn, supra,* 388 U.S. at 375, 87 S.Ct. 1856.

9. Though not at issue in this action, HI, as did Topco, grants its franchisees holds for likely site of future expansion, and had given one to Fleck for the Elizabeth site, which hold had expired prior to the AMI application (F 66).

10. The parent company town policy has the same effect as the radius letter policy—the power to grant franchises resides with the Executive Committee, which in effect allocates territories between company-owned inns and franchised inns (F 30).

ment, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S. Ct. 467, 471, 83 L.Ed. 610 (1939).[11]

*Local Conspiracy.* In the instant situation, viewed more narrowly, the inference is inescapable that HI found the Newark Airport locale favorable for motel expansion. Its existing franchisee Fleck had projected a need for additional rooms (F 65) and it had been represented to Fleck that a franchise commitment letter would issue (F 72). Despite these market conditions, AMI's application for a franchise in the identical area was denied after objection was made by Fleck. Significantly, Kemmons Wilson, Chairman of the Board of HI, informed AMI to "make a deal" with Fleck, and HI would abide the result (F 73–75).

▉ Regardless of whether the radius letter policy in *general* constitutes a conspiracy to allocate territories horizontally, as I have held above, the facts surrounding the Elizabeth application by AMI, the dealings by HI with Fleck, and the ultimate denial of a franchise to AMI, constitute a *local* conspiracy to allocate territories horizontally so as to prevent any competition between Fleck and any new Holiday Inns franchisee (F 76).

#### B. *Parent Company Towns*

I have found that HI itself owns and operates 281 Holiday Inns in 152 different cities and towns in the United States (F 1). In over half of these cities and towns, including New Orleans, Fort Worth, Knoxville and Saratoga Springs, HI owns and operates the only Holiday Inns (F 21). HI has a policy of discouraging or rejecting franchise applications from its independent franchisees, including AMI, for sites in parent company towns, even though there is demand for additional hotel rooms (F 22–29). In Fort Worth for example, HI constructed a new company-owned inn after having rejected an informal AMI application for a franchise (F 25). When HI does not desire competition for a company-owned inn, HI refuses to grant franchises.

Plaintiff has raised the parent company town practice primarily to establish the anticompetitive operation of the overall Holiday Inns System, arguing that the non-Holiday Inn clause in combination with the parent company town policy insulates company-owned inns from any form of competition from Holiday Inns franchisees. Although the

---

11. The conspiracy can be viewed not only as one to give effect to the will of HI in insulating each franchisee, but also as one to give effect to the will of Fleck to prevent competition with him. *See Interstate Circuit, supra; General Motors, supra.*

Plaintiff also urges that the conspiracy among HI and existing franchises not to grant new franchises which would compete excessively with existing franchises be viewed as a group boycott, illegal per se. *See* 9 Von Kalinowski § 65.03(1). However, both United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) and Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the two leading group boycott cases, indicate that the situation before this court does not constitute a group boycott. In *General Motors*, "the [franchised Chevrolet] dealers collaborated through the [dealer] associations and otherwise, among themselves and with General Motors, both to enlist the aid of General Motors and to enforce dealers' promises to forsake the discounters." *General Motors, supra*, 384 U.S. at 127, 86 S.Ct. at 1329. The individual franchised dealers as well as the franchisor refused to deal with the discounters. In *Klor's*, manufacturers and distributors of electrical appliances had conspired among themselves and with a major retailer, Broadway-Hale, "either not to sell to *Klor's* [Broadway-Hale's next-door neighbor and competitor] or to sell to it only at discriminatory prices and highly unfavorable terms." *Klor's supra*, 359 U.S. at 209, 79 S.Ct. at 708. By contrast, in the instant case only HI deals with its franchisees; there is no group that can refuse to deal with any franchisee, absent a conspiracy among HI, Howard Johnson, Hilton, etc. which is not alleged. Though this court has found a conspiracy among HI and its existing franchisees to foreclose HI's dealing with certain franchise applicants, the group boycott analysis is inapposite.

parent company town policy is effectuated by unilateral action—i. e. the grant or denial of a Holiday Inns franchise application—and although AMI has not emphasized the policy's operation standing alone, I think it useful to analyze it separately so as to better describe the entire System.

*Restraint of Trade.* HI's market positions as both a franchisor and a "franchisee" create a situation similar to that in United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). McKesson distributed its own brand of products directly to retailers through its own wholesale division, and indirectly through independent wholesalers. Although under the Miller-Tydings Act and the McGuire Act McKesson could "fair trade" its products through independent wholesalers, McKesson lost this exemption from the *per se* illegality of price fixing because its own wholesale division was a competitor with the independent wholesalers. Similarly, whereas HI may grant or reject franchise applications at will when it operates as a franchisor, the thrust of *McKesson* is that it may no longer exercise that power when a franchise applicant seeks to compete directly with a company-owned inn.[12]

Two courts have already applied the *McKesson & Robbins* rationale to void distribution arrangements involving a manufacturer's operation on the same functional level as its distributors.[13] In Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.1969), aff'd per curiam, 417 F.2d 621 (2d Cir. 1969), *Minolta* (importer/manufacturer) inserted into a distribution agreement with Interphoto (distributor) an enumeration of 13 states in which Interphoto was prohibited from distributing Minolta products. This area included states in which Minolta acted as its own distributor and sold its products directly to retailers. Minolta continuously attempted to enforce its territorial prohibitions. From "the face of the sales agreement with Interphoto," the court found that "Minolta has combined and conspired to divide and allocate geographic markets . . . . The effect of such contracts is to eliminate competition among the distributors and with Minolta." 295 F.Supp. at 719–720. Similarly, in Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894 (5th Cir. 1973), Hobart, a manufacturer distributing directly to some customers, signed a distribution agreement with Gilliland (distributor). This agreement, which was enforced, limited the territory in which Gilliland could sell both Hobart-brand and Gilliland-brand products. "The Hobart distribution agreement, while appearing to allocate territory vertically, in fact, resulted in a horizontal territorial allocation between Hobart and its own distributors," and was held illegal *per se. Id.* at 899.

In the instant situation, HI competes in some instances with its own franchisees (F 21) by permitting franchised Holiday Inns in the same towns as contain company-owned inns.[14] In other towns, such as those for which AMI's applications were rejected, HI declines to compete with its own franchisees (F 22–29). The parent company town policy, stemming from HI's power to grant or deny franchises, therefore insulates company-owned inns across the United States from *unwanted* competition from

---

12. Since applications for franchise sites in proximity to company-owned Inns may be approved only by the HI Executive Committee (F 30), HI has added at least a procedural impediment to approval of such applications.

13. The relationship between a manufacturer and a distributor is the functional equivalent of that between a franchisor and a franchisee.

14. Approximately 76 towns contain both company-owned Holiday Inns and independently franchised Holiday Inns. Although the testimony is equivocal, it appears that except for ten or so towns having both types of Holiday Inns, the independently franchised inns were operating *prior* to the time that the parent company built its own inn(s) in the town (Tr. 826–29).

independently franchised Holiday Inns. This market effect was condemned by the *Interphoto* and *Hobart* courts.

■ *Contract, Combination or Conspiracy.* For a restraint of trade to be illegal, however, it must result from a contract, combination or conspiracy. It is urged that AMI's repeated acquiescence in HI's refusal to grant AMI franchises in various parent company towns establishes a combination and conspiracy between AMI and HI to allocate markets horizontally. For example, in Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872, 19 L.Ed.2d 998 (1968), a price fixing case, the Supreme Court asserted that "petitioner [newspaper carrier] could have claimed a combination between respondent [publisher] and himself, at least as of the day he unwillingly complied with respondent's advertised price [for its newspaper]." [15] Similarly, in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), Parke, Davis had specified resale prices for retailers. The company was found to have created a combination "with the retailers . . . to maintain retail prices . . .," *id.* at 45, 80 S.Ct. at 512, which arose through the retailers' acquiescence to the suggested prices, secured by threats of termination. Here AMI's "acquiescence" to HI's parent company town policy—a horizontal allocation of markets—was "secured" by AMI's inability to do other than acquiesce.

I find it impossible to apply the rationale of *Albrecht* and *Parke, Davis* to the instant situation. In both of those cases, the coerced parties could have acted differently; they could have maintained their prices at a non-price-fixed level. It took the coercing and coerced parties acting together to fix the prices. However, here AMI could not have taken it upon itself to build a Holiday Inn even if HI had no parent company town policy. Entering a franchising system is not analogous to setting one's own

prices. HI has merely exercised a unilateral power to deny franchise applications. Hence, there can be no combination or conspiracy.

Nor is there involved a contract in restraint of trade; the parent company town policy cannot be found explicitly or implicitly in the franchise agreement. In both *Interphoto* and *Hobart*, on the other hand, the condemned territorial allocations were found on the face of the agreements signed by the manufacturers with their respective distributors. Standing alone, therefore, the parent company town policy, restrictive of competition though it is, may not violate Section 1 of the Sherman Act.

## II. *The Non-Holiday Inn Clause*

Each Holiday Inns franchise agreement contains a clause which provides "that licensee will not, directly or indirectly, own any interest in, operate, or be in any manner connected with or associated with, any inn, hotel or motel, during the period of this license, except Holiday Inns." As this clause is contained in the franchise contracts, there need be no inquiry as to the existence of a combination or conspiracy.

■ *Restraint of Trade: Rule of Reason.* Determining whether an arrangement violates the rule of reason under Section 1 of the Sherman Act requires a court to examine the business justifications for a restraint, the practices generally obtaining in the industry, and the precise harm flowing from a restraint, in addition to other considerations summarized by Justice Brandeis in *Chicago Board of Trade, supra.*

■ The asserted business justification for the non-Holiday Inn clause is that it is necessary to protect the Holidex System of national reservations and referrals. Although I have found Holidex to be important to the success of Holiday Inns (F 11), I hold that the Holidex System can be protected adequately without a "device" as restrictive

15. It is no defense to an antitrust action that the plaintiff may have been involved with the defendant in a conspiracy to restrain trade. *See* Section IV *infra.*

of competition as the non-Holiday Inn clause. There are three reasons under-lying this conclusion.

First, national hotel chains utilizing national referral systems, which are in competition with HI, have enjoyed success without so severely restricting their respective franchisees. For example, Hilton only requires prior written consent before a franchisee can operate a non-Hilton Inn, which consent has been freely given (F 47). Howard Johnson only prohibits operation of a non-Howard Johnson Inn within a 25 mile radius of the franchisee's existing inn, and has provision for a consent to exceptions (F 48). Sheraton has no restrictions at all (F 49).

Second, HI asserts concern over the possibility that AMI in Roanoke may refer a guest who inquires about accommodations at Newark, to AMI's putative Newark Airport Sheraton Inn instead of to the existing Newark Holiday Inn. To allay this concern, HI can rely upon and enforce its "best efforts clause" (F 40), or its other contractual provisions (*see, e. g.*, F 9, 42). It should be noted that Sheraton relies completely upon a clause requiring its franchisees to recommend, promote and encourage the use of all Sheraton Inns (F 49). Even though HI argues that a best efforts clause is more difficult to police than the non-Holiday Inn clause, I have found that both clauses are equally difficult to enforce (F 44).[16]

Third, HI asserts concern about a "bait-and-switch" operation, wherein a Holiday Inns franchisee would build a non-Holiday Inn adjacent to its Holiday Inn franchise and would refer an overflow of guests to its non-Holiday Inn instead of to the next nearest Holiday Inn. To forestall such a situation, HI might simply prohibit ownership or operation of a non-Holiday Inn within a specified radius from the franchisee's Holiday Inn, as does Howard Johnson.

The harm flowing from the non-Holiday Inn clause is the foreclosure of all hostelers competing with HI from doing business with all HI franchisees (F 77–79). By the same token, the non-Holiday Inn clause precludes AMI from owning, for example, a Sheraton Inn in competition with a franchised or company-owned Holiday Inn, even at a site distant from those sites at which AMI has Holiday Inns (F 23–26). *Cf.* Cities Service Oil Co. v. Coleman Oil Co., 470 F.2d 925, 931 (1st Cir. 1972), cert. denied, 411 U.S. 967, 93 S.Ct. 2150, 36 L. Ed.2d 688 (1973).

"[E]ven otherwise reasonable trade arrangements must fall if conceived to achieve forbidden ends, . . ." Times Picayune v. United States, 345 U.S. 594, 614, 622, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953); United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Hoopes v. Union Oil, 374 F.2d 480, 486 (9th Cir. 1967). HI could have protected its referral system by relying upon its best efforts and other contract clauses. A restraint on trade as drastic as the non-Holiday Inn clause was and is unnecessary. As I have found, the effect of the non-Holiday Inns clause "is the intended one of reducing and preventing competition among Holiday Inns franchisees and between franchised inns and company-owned inns" (F 50).

*Restraint of Trade: Exclusive Dealing:* Defendant, however, contends that the non-Holiday Inn clause is an exclusive dealing arrangement, and, as such, is justified prima facie unless it results in anticompetitive effects more substantial than those discussed above.[17] The clause does condition the grant of a Hol-

---

16. It would be difficult to discover whether an owner of a closely-held Holiday Inns franchise also owned a partial interest in a non-Holiday Inn unless a guest referred to the latter inn complained to HI. This would be the same manner in which a violation of the best efforts clause would be discovered.

17. Such contracts, because they "may well be of economic advantage to buyers [AMI] as well as to sellers [HI], and thus indirectly of advantage to the consuming public," Standard Oil Co. of California v. United States, 337 U.S. 293, 306–307, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949), may be sus-

iday Inns franchise upon the franchisee's agreement to forebear from "dealing" with hostelers competing with HI.[18] However, since no sales are herein involved, the franchisee cannot benefit in terms of any assured source of supply or in terms of decreased inventory costs. Indeed, the facts of this case indicate how one-sided the clause's operation may be—HI has not granted AMI all the franchises (i. e. "hotel beds") AMI desires or needs. Nevertheless, *assuming* the clause to create an exclusive dealing arrangement as defendant contends, I hold that it would still violate Section 1.

Exclusive dealing arrangements are generally tested under Section 3 of the Clayton Act, 15 U.S.C. § 14,[19] but they may also violate Section 1 of the Sherman Act. However, if an arrangement fails to violate Section 3 it does not violate Section 1, Tampa Electric Co. v. Nashville Co., 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), because Congress passed Section 3 to prohibit "a practice thought to be beyond the reach of the Sherman Act." Standard Oil Co. of California v. United States, 337 U.S. 293, 312, 69 S.Ct. 1051, 1061, 93 L.Ed. 1371 (1949). A court confronted with a Section 1 exclusive dealing case must therefore apply the Section 3 standard that the arrangement "may . . . substantially lessen competition or tend to create a monopoly in any line of commerce," and if a violation is found, then apply the rule of reason standards discussed above.

The leading exclusive dealing decision is *Tampa Electric, supra,* a Section 3 case, which involved a 20-year re-

quirements contract, one form of exclusive dealing. Tampa Electric, a public utility serving a 3600 square mile area in the vicinity of Tampa, Florida, entered into a contract involving $128 million in coal purchases. The seller breached the contract, claiming illegality. The district court failed to define the relevant geographic and product markets in holding the contract illegal. The Supreme Court, however, defined the relevant coal producing market as a seven-state region in which 700 firms produced coal for purchasers such as Tampa Electric. The Supreme Court held "that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence." 365 U.S. at 329, 81 S.Ct. at 629. The Court upheld the contract because the $128 million in foreclosed purchases represented only .77 percent of the coal produced in the relevant market, not an unreasonable amount. *See also* United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). The Court counseled:

> In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.

365 U.S. at 327, 81 S.Ct. at 628. The guidelines to be followed are: definition of the line of commerce on the basis of the facts peculiar to the case; charting of the area of effective competition in the known line of commerce; finding foreclosure of a substantial share of the

---

tained under the rule of reason. "If the contract does not foreclose competition from a substantial portion of the market, then an antitrust violation will not result." 9 Von Kalinowski § 64.01(1). *See also Schwinn, supra,* 388 U.S. at 380, 87 S.Ct. 1856.

18. For example, AMI may not construct a Sheraton Inn at the Elizabeth site because AMI owns a Holiday Inn in Roanoke.

19. "It shall be unlawful for any person engaged in commerce . . . to lease or

make a sale or contract for sale of goods . . . or other commodities . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

relevant market. *Id.* at 327–328, 81 S. Ct. 623.

Assuming an exclusive dealing arrangement in the instant case, I would hold that the relevant "product" market is national hotel-motel chains or referral groups, and the relevant geographic market is the United States. In terms of product, the Holiday Inns System is a national hotel chain, utilizing a national customer referral system. The only justification for the non-Holiday Inn clause seriously pressed by HI and the IAHI has been the clause's role in protecting the Holidex System of computorized national referrals. I find the Holidex System to have "been very important to the growth and success of the Holiday Inns System and [to have] resulted in increased referrals within the System (F 11).[20] In terms of geography, AMI owns or has applied for franchises in the entire United States, except for the Far West (F 2, 23–26), and has been unable to deal with other hotel chains operating nationally, such as Sheraton Inns (F 77–78). In addition, the non-Holiday Inn clause forecloses *every* HI franchisee, many of whom own franchises in the geographic regions from which AMI is absent. Although there is nothing in the record to indicate that any HI franchisee other than AMI has sought to affiliate with hostelers other than HI, it is impossible to determine whether other franchisees would have sought to so affiliate but for the non-Holiday Inn clause. There is, however, evidence that one HI franchisee, Albert Pick, has been precluded by HI from maintaining his own independent chain of non-Holiday Inns (F 34–36).

The entire Holiday Inn System constitutes 18.8 per cent of the relevant product and geographic markets, as I have defined them, and the independent franchisees alone constitute 14.7 percent (F 58).[21]

Applying the *Tampa Electric* standards, therefore, the line of commerce herein involved is hotel-motel chains utilizing national referral systems. The area of effective competition among national hostelers for hotel-motel outlets is the United States. The percentage of the relevant market foreclosed is 14.7 percent, for it is the independent Holiday Inns franchisees that are prevented from affiliating with the national hotel-motel chains that compete with Holiday Inns. This percentage is 19 times that found inadequate in *Tampa Electric*. AMI's revenue from the operation of only 48 of the 1099 franchised Holiday Inns is $44 million. In addition, the foreclosure herein involved is not only potential, but rather in the cases of AMI and Albert Pick, actual.

Moreover, in *Standard Oil, supra,* a Section 3 case relied upon in *Tampa Electric,* Standard Oil's combined 1946

---

20. For the years 1970, 1971 and 1972 Holidex has accounted for 30–38 percent of the total occupancy of all Holiday Inns (F 12).

21. Two other possible relevant markets should be considered. One is the entire hotel-motel industry in the United States, without regard to motel size or to national referral systems. Utilizing the 1967 data submitted to the court, the Holiday Inns System accounted for 1.9 percent and the independent franchisees for 1.6 percent of the total 44,903 hotels, motels and motor hotels in the United States. (F 53). Though these percentages are double that found inadequate in *Tampa Electric,* they fail to reflect the unique manner of operation initiated and utilized by Holiday Inns—including national referrals and standardized amenities—and this alternate market definition should therefore be rejected. A second possibility is to focus upon all hotels and motels in the United States having over 50 rooms. This possibility at least takes account of the amenities, such as swimming pools, cocktail lounges, adequate parking, that are available at all Holiday Inns and that are usually not available for financial reasons in inns having fewer than 50 rooms, of which Holiday Inns has only four (F 55). In 1971, the Holiday Inns System accounted for 17 percent of this market in terms of properties, and for 24.7 percent of this market in terms of rooms. The Holiday Inns franchisees alone account for 14 percent and 18.3 percent respectively (F 56). The reason for rejecting this possible market definition is that it fails to take into account the national referral system, important to Holiday Inns' growth and success.

gasoline sales in the relevant "Western Area" of the United States constituted 23 percent of the total gallonage sold, and its exclusive dealing contracts covered over 5900 (16 percent) of the total independent retail outlets. Although the Supreme Court held that Standard Oil did not occupy a dominant position in the retail market for gasoline, the court held that "the showing that Standard's requirements contracts affected a gross business of $58,000,000 comprising 6.7% of the total in the area goes far toward supporting the inference that competition has been or probably will be substantially lessened." [22] 337 U.S. at 305, 69 S.Ct. at 1058.

Applying the *Standard Oil* standards, HI forecloses the franchisees of 1099 "outlets" from affiliating with hotel chains in competition with HI (F 1). The 14.7 percent of the relevant market that is foreclosed from competing hostelers (F 58) is nearly identical to the 16 percent foreclosed in *Standard Oil*. I hold that the non-Holiday Inn clause, even if it were to constitute an exclusive dealing arrangement, would violate the *Standard Oil* Court's test under Section 3.[23] Since wholly apart from the exclusive dealing analysis I have held above that the non-Holiday Inn clause violates Section 1, if I were to hold the clause to constitute an exclusive dealing arrangement, it would still violate Section 1.

### III. *Combined Effect and Purpose of HI's Policies and Contracts*

HI's radius letter policy standing alone is a means of allocating territories horizontally so as to reduce intra-brand competition among HI franchisees. HI's parent company town policy, even though legal, has the effect of allocating territories between company-owned inns and HI franchisees so as to reduce intra-brand competition. Furthermore, the non-Holiday Inn clause standing alone is an unreasonable restraint of trade as reducing inter-brand competition among Holiday Inns franchisees.

Regardless of the market effect of each of these devices standing alone, however, their combined effect and the totality of their operation results in a horizontal allocation of territories. The radius letter policy standing alone prevents AMI from building a Holiday Inn in competition with Fleck at the Newark Airport, an *intra-brand* restriction of competition. The effect of adding the non-Holiday Inn clause to the radius letter policy is to prevent AMI from building a Sheraton Inn as well, an *inter-brand* restriction. Similarly, the parent company town policy standing alone prevents AMI from building a Holiday Inn in competition with the company-owned inns in Fort Worth. The non-Holiday Inn clause also prevents AMI from building a Sheraton Inn in Fort Worth.

The combined effect of these devices was known to each of the franchisees when they entered into their contracts with HI, and they have sought to utilize the devices through responses to radius letters and attempts to discover and eliminate violations of the non-Holiday Inn clause (F 38–39). Each franchisee, and each company-owned inn stands to

---

22. Refusing to require proof that competition among Standard Oil and other gasoline producers had actually diminished, 337 U.S. at 311, 69 S.Ct. at 1060, the Supreme Court held Standard Oil's exclusive dealing arrangements illegal, and wrote:

[T]o demand . . . evidence as to what would have happened but for the adoption of the practice that was in fact adopted or to require firm prediction of an increase of competition as a probable result of ordering abandonment of the practice, would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts.

23 I do not view the more qualitative-type analysis of market foreclosure employed by the Court in *Tampa Electric* as overruling the analysis of *Standard Oil*. Each of those courts was confronted with a different factual situation. The former case involved the breach of an exclusive dealing contract removing only one consumer from the market. The latter case involved the removal of 5900 consumers. The percentage of market foreclosure in the former case was .77; in the latter case it was 16.

gain from these practices and clause in the form of restricted competition. This knowledge and action establishes a combination and conspiracy under the standards discussed above.

"[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '. . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). The Holiday Inns System viewed as a whole is a combination and conspiracy to allocate territories horizontally, illegal per se.

## IV. HI's Affirmative Defenses

▮ Defendant has asserted the claims of laches, waiver and estoppel, unclean hands, and in pari delicto as affirmative defenses. The common law defenses of laches, waiver and estoppel have no application in a federal antitrust action. South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767, 784 (6th Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971). See also Sola Electric v. Jefferson, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1943). The defenses of unclean hands and in pari delicto were struck down in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Defendant's citation to Singer v. A. Hollander & Son, Inc., 202 F.2d 55 (3d Cir. 1953), for the availability of the unclean hands defense is misplaced, since Singer predates Perma Life. See also Skil Corp. v. Black & Decker Mfg. Co., 351 F.Supp. 65 (N.D.Ill.1972) (McLaren, J.).

▮ If AMI be guilty of antitrust violations of its own, then HI ought to bring a separate action. Kiefer Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). The fact that AMI has responded to radius letters and sought enforcement of the non-Holiday Inn clause does not constitute involvement in the antitrust violation I have found, sufficiently complicit to invoke the dictum of the Perma Life Court that:

"We need not decide, however, whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto, for barring a plaintiff's cause of action."

There is no evidence in the instant case that AMI instigated HI's parent company town or radius letter policies, or originally sought the inclusion of the non-Holiday Inn clause in franchise agreements. There is no evidence that AMI was any more forceful in asserting its rights under the franchise agreement as it has existed until today than any other franchisee. "[T]he public interest in terminating anticompetitive conduct takes precedence, and any incidental benefit to the plaintiff may be regarded as a worthwhile price therefor." Skil Corp., supra, 351 F.Supp. at 66.

The court is not called upon at this point to determine whether some form of in pari delicto is available as a defense or set-off to an action for triple damages. Cf. Skil Corp., supra, 351 F. Supp. at 66. Defendant's argument will be considered anew at the trial on damages.

## V. Relief

The plaintiff's complaint seeks relief in 7 particulars. The relief sought in prayers 5 (damages)[24] and 6 (attorneys' fees)[25] cannot be determined at

24. "That judgment be entered in favor of plaintiff AMI and against defendant Holiday [Inn] in an amount to be subsequently determined and that, in accordance with law, this amount be trebled."

25. "That plaintiff recover from defendant the costs of this suit, including reasonable attorney's fees, as required by Section 4 of the Clayton Act."

this time, but must await further hearing. As to the equitable relief sought,[26] the parties shall, consistent with this opinion, brief the following issues:

(1) Is a further hearing required in connection with the relief sought? If so, what is the character of the evidence to be presented?

(2) If no further evidence is to be adduced, what form shall the relief take? Each party shall submit a proposed order.

(3) What other matters pertaining to relief or to the form of judgment should the court consider?

In normal course, I would await the above submissions before entering any order pertaining to plaintiff's requested relief. However, this action has proceeded under the continuing threat that the City of Elizabeth would revoke plaintiff's deed, due to a failure to commence construction. So that there will be no additional time impediment on plaintiff's application, for which short notice is authorized, I will enter an interim order (pending entry of an all inclusive final order) granting the relief sought by paragraphs 2 (declaratory judgment) [27] and 3 (injunction) [28] of the complaint's prayer. In addition, plaintiff may move on such an interim basis for the relief sought in paragraph 4 (franchise applications),[29] but only with regard to the Elizabeth property.

The final order to be entered herein will include, in addition to the other relief then decreed, the provisions of any interim order with whatever modifications or amendments that may be necessary.[30]

license agreement between Holiday and AMI because of any inn, hotel or motel AMI may build, own or operate on its Elizabeth, New Jersey property;

(4) "That the Court issue an injunction requiring Holiday to act on any future application by AMI for a Holiday Inn license agreement based solely on proper and appropriate business considerations."

---

26. (1) "That the Court adjudge and decree that Holiday has engaged in an unlawful combination, conspiracy to restrain and monopolize and Holiday has attempted to monopolize the interstate trade and commerce described herein in violation of Sections 1 and 2 of the Sherman Act;

(2) "That the Court declare the clause in the licensing agreements between AMI and Holiday prohibiting AMI from owning any interest in or being associated with any inn, motel or hotel other than a Holiday Inn illegal and unenforceable with respect to any inn, motel or hotel AMI may build, own or operate on its Elizabeth, New Jersey property;

(3) "That the Court issue an injunction restraining Holiday from cancelling, terminating or threatening to cancel any existing

27. See note 26 supra.

28. Id.

29. Id.

30. Defendant's after-submitted "Offer of Designated Deposition Portions into Evidence," objected to by the plaintiff, has been admitted into evidence, and the submitted order may reflect this ruling.